UNITED STATES of America

v.

Antoine PETTIFORD

No. CR. L–02–0522.

United States District Court,
D. Maryland.

Dec. 12, 2003.

Michael T. Citaramanis, Office of the Federal Public Defender, Greenbelt, MD, for Defendant.

James G. Warwick, Office of the United States Attorney, Thomas M. DiBiagio, Baltimore, MD, for Plaintiff.

## MEMORANDUM

LEGG, Chief Judge.

Pending before the Court are defendant Antoine Pettiford's Motion to Suppress Evidence and Motion to Suppress Statements. The Court held an evidentiary hearing and, for the reasons set forth below, will DENY Pettiford's motions by separate Order.

## I. Background

On November 21, 2002, a federal grand jury returned a one-count indictment charging Pettiford with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). The charge arose from an alleged "road rage" shooting that occurred in Baltimore City on July 4, 2002. Now before the Court are Pettiford's motions requesting the Court to suppress the gun recovered from his vehicle, the results of the gunshot residue test performed on his hands, and statements that he made to the police. The evidentiary hearing revealed the following facts.

### A. The Stop of Pettiford's Vehicle

At 11:54 a.m. on July 4, 2002, a 911 dispatcher announced over police radio frequencies that an armed black male in a green car had fired shots at another car at the intersection of Harford Road and Erdman Avenue. The dispatcher also announced that the green car was last seen heading north on Harford Road. Sergeant Abdul Malik Lundy of the Baltimore City Police Department responded and drove north on Harford Road in search of the green car.

At approximately 12:00 p.m., Sergeant Lundy observed a green car at the intersection of Harford Road and Lake Avenue, which is only two blocks north of the loca-tion of the shooting. The car was heading west on Lake Avenue. After reaching the intersection, where Sergeant Lundy sat in his marked police car, the driver placed the car in reverse and began quickly backing down Lake Avenue. Sergeant Lundy interpreted this act as an attempt to evade contact with the police. Sergeant Lundy activated his lights and siren, made a right turn onto Lake, and saw the car quickly back into a driveway in an effort to turn around. As soon as Sergeant Lundy turned onto Lake Avenue, he noticed that the driver of the green car, later identified as Pettiford, was a black male and that the vehicle's front passenger window was broken and pieces of glass were falling to the ground. Suspecting that the driver and the car were involved in the shooting, Sergeant Lundy used his vehicle to block the car, at which point Pettiford stopped.

Officers removed Pettiford from the car, but did not handcuff him. Although the officers initially had their guns drawn, they holstered them when they realized Pettiford did not have a weapon on his person. The officers noticed bullet holes in the driver's side door of Pettiford's car and asked him about the shooting. Pettiford responded that another person, whom he did not know, had shot his car during a "road rage" incident, that he was a victim, that he was not hurt, and that other people had been in his car at the time of the shooting, but he had dropped them off on Lake Avenue.

After calling the dispatcher, officers learned that Pettiford's license had been revoked, and Officer Richard Lyles issued Pettiford a citation for driving with a revoked license. Officers checked the interior of Pettiford's car for the presence of firearms, but did not search the compartments. Although the officers did not find any weapons, they decided to detain the vehicle, which they believed was evidence of a shooting, until detectives arrived and

decided how to proceed. During this time, the police attempted to find the other individuals who had been in Pettiford's car at the time of the shooting.

### B. Police Learn of Other Person Involved in "Road Rage" and Initiate Further Investigation

At approximately 12:30 p.m., the police dispatcher announced that Baltimore County police had located a man who had been shot during the "road rage" incident. By this time, Detective Gregory Jenkins had arrived on the scene, was aware that the "road rage" shooting victim had been located, and suspected that Pettiford may have been a participant in the shooting, not just a victim as he had claimed.

After arriving at the scene, Detective Jenkins learned that Pettiford's car had bullet holes, that Pettiford had told police that someone had shot at him, and that Pettiford did not stop when Sergeant Lundy activated his lights and siren. Detective Jenkins, therefore, instructed Officer Lyles to do the following: (i) arrange for Pettiford's car to be towed so that it could be processed for evidence and a search warrant obtained; (ii) transport Pettiford to police headquarters for gunshot residue ("GSR") testing; (iii) transport Pettiford to the police station for an interview; and (iv) "stand by" Pettiford, i.e., make sure he did not leave. The police did not obtain a warrant to seize Pettiford's car or to conduct the GSR test on Pettiford's hands.

Officer Lyles remained at the scene with Pettiford and arranged for his car to be towed. While waiting for the tow truck, Pettiford talked on his cell phone and also spoke in person to a friend and a news reporter who had both arrived at the scene. When Officer Lyles told Pettiford that his vehicle would be towed, Pettiford did not object. Officer Lyles also told Pettiford that he needed to have his hands tested, as a formality, to see whether he had recently shot a gun. Pettiford responded "ok."

### C. GSR Testing and Questioning of Pettiford

The tow truck eventually arrived and, at approximately 3:00 p.m., Officer Lyles escorted Pettiford to police headquarters for GSR testing. At approximately 3:30 p.m., the police tested Pettiford's hands for the presence of gunshot residue.[1] Officer Lyles then escorted Pettiford to the station house, where they arrived at approximately 4:00 p.m. Officer Lyles left Pettiford in a locked interview room, where he remained for the next four and a half hours, except when he was permitted to leave to use a nearby bathroom. During his time in the interview room, Pettiford was not handcuffed, had his cell phone and other personal property, and spoke through the door to friends of his who had stopped by the station.

At approximately 8:00 p.m., the police executed a search warrant for Pettiford's vehicle and recovered a firearm in the glove compartment. At 8:28 p.m., Detective Jenkins and Detective Jae Kim attempted to interview Pettiford and advised him of his *Miranda* rights. Pettiford countersigned a form that explained his *Miranda* rights, but he refused to make a statement,[2] at which point the interview

---

1. The test revealed the presence of gunshot residue.

2. While reading Pettiford his rights, Detective Kim read the portion of the Explanation of Rights form that states "I am willing to answer questions, and I do not want an attorney at this time. My decision to answer questions . without having an attorney present is free and voluntary on my part." Detective Kim then stated "And that is in case you want to make a statement now without a lawyer, you may sign that." Pettiford responded, "No, uh uh." Detective Kim replied, "You do not wish to make a statement?," at which point Pettiford stated "No." Detective Kim then wrote the

terminated. Although Pettiford was not afraid to ask for an attorney, he did not do so.

According to Detective Jenkins, he re-entered the interview room at approximately 9:39 p.m., showed Pettiford the gun that had been recovered from his car, and asked Pettiford if he recognized it. Pettiford agreed to talk, at which point Pettiford was advised of his *Miranda* rights for a second time.[3] Although Pettiford knew that he had the right to refuse to make a statement,[4] he signed a form waiving his *Miranda* rights and confessed to the police that he had fired his weapon earlier that day at the intersection of Harford and Erdman.

## II. Analysis

Pettiford asserts several grounds for suppression. First, Pettiford contends that the stop of his car and his subsequent detention and arrest were unlawful and that the gun, the results of the GSR test, and his statements are fruits of this unlawful police conduct and must be suppressed. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (discussing the "fruit of the poisonous tree" doctrine). Second, Pettiford claims that the police illegally seized his vehicle and that the Court must, therefore, suppress the gun later recovered from its glove compartment. Third, Pettiford argues that the warrantless GSR test was illegal and the results of the test should, therefore, be suppressed. Finally, Petti-

ford asks the Court to suppress his statements to the police on the grounds that the police violated his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and that his waiver of those rights was neither voluntary nor knowingly and intelligently given.

### A. Vehicle Stop

 Pettiford contends that the stop of his vehicle violated the Fourth Amendment. Under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a police officer may "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow,* 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). Although the standard is not onerous, there must be "at least a minimal level of objective justification for making the stop." *Id.* In evaluating whether the stop of Pettiford's vehicle was legal under *Terry,* the Court looks to the totality of the circumstances. *United States v. Sokolow,* 490 U.S. 1, 8, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *see Park v. Shiflett,* 250 F.3d 843, 851 (4th Cir.2001).

Pettiford argues that the police seized him the moment Sergeant Lundy activated his lights and siren, thereby asserting authority over Pettiford. Pettiford claims that at this point, Sergeant Lundy knew only that he was a black male driving a green car and that this information was

word "refused" on the line where Pettiford would have signed had he agreed to make a statement.

**3.** At the hearing, Pettiford presented a different version of events. Pettiford testified that before the detectives read his *Miranda* rights to him a second time, they entered the room, put shackles on him, and told him that if he agreed to talk, they would essentially assist him in devising a self-defense theory of his case. According to Pettiford, he did not want

to talk, but succumbed because the detectives were so persistent. In addition, Pettiford denied that the detectives had the gun with them when they re-entered the room. Having considered the testimony of Detective Jenkins and Pettiford, the Court credits Detective Jenkins's testimony about the events in the interview room.

**4.** In fact, Pettiford admitted at the hearing that he had previously been arrested at least ten times and knew his rights.

insufficient to justify a seizure. The Court disagrees.

A seizure does not occur unless physical force is applied or a person submits to a show of police authority. *California v. Hodari D.*, 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991); *see also United States v. Wiggins*, 97 F.3d 1450, 1996 WL 526891 at *2 (4th Cir.1996) (unpublished). Thus, a seizure does not occur, despite a show of authority, until the subject yields. *Hodari D.*, 499 U.S. at 626, 111 S.Ct. 1547. When Sergeant Lundy activated his lights and siren, Pettiford did not yield; rather, he proceeded to back quickly into a driveway in an attempt to evade the police. He yielded only when Sergeant Lundy physically blocked his path. Accordingly, the seizure occurred at that moment.

When Sergeant Lundy seized Pettiford, only minutes after the police dispatch, he was aware of the following: (i) Pettiford was a black male, thereby fitting the available description of the shooter, (ii) Pettiford's car was green, thereby fitting the available description of the shooter's vehicle; (iii) Pettiford was two blocks north of the location of the shooting, the direction in which the shooter had headed; (iv) Pettiford fled at the sight of Sergeant Lundy's police vehicle[5]; (v) Pettiford did not yield when Sergeant Lundy activated his lights and siren; and (vi) the front passenger window of Pettiford's car was broken and glass was falling to the ground, thus suggesting that the window had recently been broken. Viewing these circumstances as a whole, the Court concludes that Sergeant Lundy's suspicion that Pettiford had been involved in the "road rage" shooting was reasonable and articulable. Accordingly, the Court finds that the stop of Pettiford's vehicle was a legal *Terry* stop for the purpose of allowing the police to investigate the reports of the shooting.

The Court would reach the same conclusion even if the seizure was, as suggested by Pettiford, based only on the fact that Pettiford is a black male and was driving a green car. Although the Court recognizes that there are limits to the authority of the police to stop individuals who simply match a basic description, the Court need not test those limits here. The police in this case were investigating a serious crime and, therefore, were permitted to stop a man matching the available description whom they located in the immediate vicinity of the shooting shortly thereafter.[6]

## B. Pettiford's Detention and Arrest

Pettiford claims that his detention and eventual arrest were illegal. As discussed

---

**5.** *See Wardlow*, 528 U.S. at 124, 120 S.Ct. 673 (stating that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion" and that headlong flight is the "consummate act of evasion" and is "certainly suggestive" of wrongdoing).

**6.** In arguing that the police illegally stopped his vehicle, Pettiford relies on *United States v. Jones*, 998 F.2d 883 (10th Cir.1993), in which the court stated that the police were not justified in stopping a vehicle based solely on its color and make and the race of its passengers. *Jones* is distinguishable from the instant case. The police in *Jones* stopped a car that contained the wrong number of passengers and that was found a mile and a half from the disturbance. In the instant case, the police found Pettiford a mere two blocks from the location of the shooting, and Pettiford was the only passenger in the car, as the dispatcher had described. The Court further notes that in *Jones*, there was "nothing about the appearance or operation of the vehicle that aroused the officers' suspicions or contributed to the justification for the stop." *Id.* at 884. In the instant case, however, Pettiford's attempt to evade the police and Sergeant Lundy's observation that Pettiford's passenger window was broken provided Sergeant Lundy with further justification for the stop.

below, however, the Court finds that (i) Pettiford's detention from 12:00 p.m. to 12:30 p.m. was legal as part of the *Terry* stop; and (ii) Pettiford's detention after 12:30 p.m., and his eventual arrest,[7] were legal because the police had probable cause to arrest from 12:30 p.m. forward.

■ During a *Terry* stop, police may briefly detain an individual in order to attempt to "obtain information confirming or dispelling the officer's suspicions" and may question the detainee and investigate the circumstances that provoked suspicion. *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). The stop may last "no longer than necessary to verify or dispel the officer's suspicion," *United States v. Leshuk*, 65 F.3d 1105, 1109 (4th Cir.1995), and, unless the investigation provides probable cause to arrest the detainee, he must be released. *Wardlow*, 528 U.S. at 126, 120 S.Ct. 673 ("If the officer does not learn facts rising to the level of probable cause, the individual must be allowed to go on his way."); *see also Berkemer*, 468 U.S. at 439–40, 104 S.Ct. 3138.

■ Pettiford was stopped at approximately 12:00 p.m. By 12:30 p.m., the police had learned enough information to provide them with probable cause to arrest Pettiford. Accordingly, the *Terry* stop, pursuant to which Pettiford was detained solely on the basis of a reasonable and articulable suspicion, lasted only thirty minutes. During that time, the police questioned Pettiford about the shooting, checked Pettiford's license and registration, searched Pettiford's vehicle, and searched for the people who had been in Pettiford's car during the shooting. This activity was certainly related to the investigation into the shooting, and the brief detention necessary to permit the police to perform these tasks lasted no longer than necessary. Accordingly, Pettiford's detention from 12:00 p.m. to 12:30 p.m. was permissible under *Terry*.

■ By 12:30 p.m., the officers' investigation had revealed the following: (i) Pettiford's car had bullet holes in the driver's door; (ii) Pettiford admitted that he had been involved in the shooting incident; and (iii) Baltimore County police had located a man who had been shot during the incident. This information, in addition to what the police knew when they stopped Pettiford's vehicle, provided probable cause to arrest Pettiford as the second "road rage" shooter.[8] *See Wilson v. Kittoe*, 337 F.3d 392, 398 (4th Cir.2003) ("An officer has probable cause for arrest when the facts and circumstances within the officer's knowledge ... are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed ... an offense." (citation and quotations omitted)). Accordingly, the detention and subsequent arrest of Pettiford were legal.

## C. Warrantless Seizure of Vehicle

■ Pettiford argues that because the police did not have a warrant to seize his vehicle, the Court must suppress the gun later recovered from its glove compartment. The police, however, may seize a car from a public street without a warrant "when they have probable cause to believe that the car itself is an instrument or evidence of crime." *United States v. Cooper*, 949 F.2d 737, 747 (5th Cir.1991);

7. As discussed in Section II.E. of this Memorandum, it is not necessary for the Court to identify the exact moment when Pettiford was arrested.

8. Pettiford was driving with a revoked license, a motor vehicle violation that empowered the police, at their discretion, to arrest Pettiford. Officer Lyles, however, exercised his discretion merely to issue a citation.

*see also United States v. Patterson*, 150 F.3d 382, 387 (4th Cir.1998) (holding that it was not necessary for police to obtain warrant to seize defendant's car when there was probable cause to believe it was used in a robbery). When Detective Jenkins decided to impound Pettiford's car, he clearly had probable cause to believe that the car was both (i) evidence of a crime[9] (the car had five bullet holes in the door and Pettiford admitted that someone had shot the car); and (ii) an instrument of a crime (as previously discussed, the police had probable cause to believe that Pettiford had returned fire during the "road rage" incident). Accordingly, the police did not need a warrant to seize Pettiford's car.

After seizing the car, the police obtained and executed a search warrant for the car and found a gun in the glove compartment. Pettiford does not challenge the warrant and does not contend that the search of his car exceeded the permissible scope of the warrant. Accordingly, the gun recovered during the search is admissible.

### D. Warrantless GSR Test

■■■■ Pettiford urges the Court to suppress the results of the GSR test, arguing that the test constituted an illegal search in violation of the Fourth Amendment.[10] As Officer Lyles testified at the evidentiary hearing, Pettiford consented to the GSR test. However, even had he not consented, the Court finds that the warrantless search was permissible.

■■■ The police may conduct a warrantless search if it is supported by probable cause and exigent circumstances exist. *Cupp v. Murphy*, 412 U.S. 291, 293, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973); *United States v. Jones*, 215 F.3d 1322, 2000 WL 690182 at *3–4 (4th Cir.2000) (unpublished). The Court finds that these conditions were satisfied in this case.

When Detective Jenkins ordered the test, he was aware that: (i) Pettiford matched the description of the shooter; (ii) Pettiford was found only two blocks from the shooting; (iii) Pettiford had fled from Sergeant Lundy; (iv) there were bullet holes in Pettiford's car door; (v) Pettiford admitted that he was involved in the "road rage" incident; and (vi) the police had located a second person who had also been involved in the incident and had suffered gunshot wounds. Detective Jenkins, therefore, had probable cause to believe that the GSR test would yield evidence that Pettiford had discharged a firearm.

Furthermore, the Court finds that exigent circumstances existed in light of the ready destructibility of the evidence sought. If Detective Jenkins had waited for a warrant before ordering the GSR

---

**9.** Pettiford's counsel noted at the hearing that the police did not tow the car of Ms. Lewis, a woman who had been in the line of fire during the "road rage" incident and whose car window had been shot out. Counsel argued that the police cannot choose to impound one car but not the other. Counsel's doubtful legal proposition need not be addressed here because the police had a good reason for differentiating between the two cars. Testimony disclosed that the police discounted the evidentiary value of Ms. Lewis's car because it was hit only in the glass window and did not contain any bullet fragments or bullet holes.

**10.** A GSR test does not invoke the protections of the Fifth Amendment because it does not provide evidence of a testimonial or communicative nature. *See United States v. Bridges*, 499 F.2d 179, 184 (7th Cir.1974) (swabbing hands does not provide evidence of a testimonial or communicative nature); *see also Kyger v. Carlton*, 146 F.3d 374, 381 n. 2 (6th Cir. 1998). In addition, because the police had probable cause to arrest Pettiford when the GSR test occurred, there is no concern that the police illegally seized him for purposes of having him submit to the test. Thus, the only issue before the Court is whether the test itself constituted an illegal search in violation of the Fourth Amendment.

test, he would have increased Pettiford's opportunity to destroy the evidence by simply washing his hands. *See Jones*, 215 F.3d 1322, 2000 WL 690182 at *4. Moreover, the government proffered at the evidentiary hearing that gunshot residue is present on the hands for only a few hours after a shooting.[11] In addition, the GSR test merely involved swabbing Pettiford's hands and was, therefore, only a minimal intrusion to Pettiford's privacy. *See id.* Accordingly, the Court finds that the warrantless GSR test did not violate the Fourth Amendment and that the results of the test are admissible at trial.

### E. Statements

In order to protect the right against self-incrimination guaranteed by the Fifth Amendment, the Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), ruled that before interrogating a suspect in custody, the police must warn him "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Burket v. Angelone*, 208 F.3d 172, 196 (4th Cir.2000) (quoting *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602). If a suspect invokes his *Miranda* rights, the law sets limits on the ability of the police to initiate subsequent questioning. Petti-

ford contends that the police violated his *Miranda* rights and urges the Court to suppress the statements he made to the police.

Pettiford's statements can be categorized as follows: (i) statements Pettiford made between the stop of his vehicle at 12:00 p.m. until the police discovered the second victim at approximately 12:30 p.m.; (ii) statements made between 12:30 p.m. and 4:00 p.m., when Officer Lyles left Pettiford in the locked interview room; and (iii) statements Pettiford made after he waived his *Miranda* rights at 9:39 p.m.[12] The Court analyzes the admissibility of each category of statements in turn.

#### 1. Statements Between 12:00 p.m. and 12:30 p.m.

 When the police stopped Pettiford's vehicle at 12:00 p.m., Pettiford responded to officers' questions by stating that another person, whom he did not know, had shot his car during a "road rage" incident, that he was a victim, that he was not hurt, and that other people had been in his car at the time of the shooting, but he had dropped them off on Lake Avenue before the police pulled him over. When Pettiford made these statements, he was detained pursuant to a legal *Terry* stop and was not yet in police "custody" as is required to invoke the *Miranda* protections.[13] Accordingly, the police were not

---

**11.** Pettiford did not challenge, or object to, the government's proffer.

**12.** The government does not seek to introduce any statements that Pettiford may have made between 4:00 p.m., when he was placed in the locked interview room, and 9:39 p.m., when he waived his *Miranda* rights.

**13.** A person is not in custody, and, therefore, not protected by *Miranda*, unless "the person has been arrested or if his freedom of action has been curtailed to a degree associated with arrest." *Burket*, 208 F.3d at 196. Thus, courts consider "whether 'a reasonable [person] in the suspect's position would have un-

derstood his situation ... as the functional equivalent of formal arrest.' " *Id.* at 197 (quoting *Berkemer*, 468 U.S. at 442, 104 S.Ct. 3138). There is no evidence to suggest that Pettiford was in custody when he made his initial statements to the police. Rather, the evidence shows that Pettiford was not handcuffed and was not yet aware that the police were going to escort him to GSR testing or to the station for questioning. Thus, a person in Pettiford's shoes would reasonably have believed that he would soon be free to go and would not have understood his situation as the equivalent of an arrest.

required to read Pettiford his *Miranda* rights before questioning him. *See Leshuk*, 65 F.3d at 1108 (stating that *Miranda* warnings are not required when a person is questioned during a *Terry* stop). Furthermore, there is no evidence that Pettiford's statements were anything but voluntary. Accordingly, the Court finds that statements Pettiford made between 12:00 p.m. and 12:30 p.m. are admissible.

### 2. Statements Between 12:30 p.m. and 4:00 p.m.

At the evidentiary hearing, the government's counsel stated that he was not aware of any statements that Pettiford made to the police between 12:30 p.m. and 4:00 p.m., but that he wanted the option to introduce any such statements at trial. In the weeks since the hearing, the government has not notified the Court, or, apparently, Pettiford, of any such statements. Timely notification to Pettiford may be required by Rule 16(a) of the Federal Rules of Criminal Procedure. The Court, therefore, considers the matter closed and will not permit the government to introduce these statements at trial.[14]

### 3. Statements Made After Pettiford Waived His *Miranda* Rights

Although Pettiford eventually waived his *Miranda* rights during the second interrogation[15], he contends that his statements should be suppressed because (i) he had invoked his right to counsel and the police, therefore, were prohibited from initiating the second round of questioning; (ii) he

had invoked his right to remain silent and, by resuming questioning, the police failed to honor his exercise of that right; and (iii) his waiver of his *Miranda* rights was neither voluntary nor knowingly and intelligently given and his statements themselves were not voluntary.

### a. Right to Counsel

 Under *Miranda*, if a suspect invokes his right to have counsel present during custodial interrogation, police may not further interrogate him until counsel is made available to him or he initiates further communication with the police. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Pettiford did not explicitly ask for an attorney. Pettiford points out, however, that he responded "no" when Detective Kim advised him that he could sign the *Miranda* waiver form if he desired to make a statement without counsel. This was an implicit refusal and any ambiguity in his response should be resolved in his favor and against the government, Pettiford maintains.

The Court finds this colloquy between Pettiford and Detective Kim insufficient to invoke Pettiford's right to counsel. In order to invoke the right to counsel and thereby prevent further interrogation, Pettiford must have unambiguously and unequivocally requested the assistance of counsel. *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994); *Burket*, 208 F.3d at 198. He,

---

**14.** Trial is not scheduled to begin until January 26, 2004. If the government believes that it is prejudiced by the above foreclosure, then it may, on or before December 19th, move to reopen this issue. The motion must (i) identify the statements the government seeks to introduce; and (ii) explain in detail why the statements are voluntary and admissible. If the government so moves, Pettiford's opposition will be due by January 7th. The opposi-

tion shall include Pettiford's views on the government's discovery obligations as well as the admissibility of the proffered statements.

**15.** The government appears to concede that Pettiford was in custody, and thus protected by *Miranda*, by the time the detectives initiated the second round of questioning. Accordingly, the Court need not decide at which point Pettiford was taken into custody.

therefore, must have "articulate[d] his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis,* 512 U.S. at 459, 114 S.Ct. 2350.

A reasonable officer in Detective Kim's circumstances could have interpreted Pettiford's "no" response simply as a refusal to answer questions, either with or without an attorney. The law did not require Detective Kim to cease questioning if an ambiguous statement by Pettiford might possibly be construed as a request for an attorney, and Detective Kim was not required to ask Pettiford questions in an attempt to clarify his desires. *Id.* at 461–62, 114 S.Ct. 2350. Accordingly, the Court finds that Pettiford did not invoke his right to counsel and that the detectives were not prohibited from initiating a second round of questioning. *See id.* at 462, 114 S.Ct. 2350 (concluding that defendant's statement that maybe he should talk to a lawyer, which is more than what Pettiford said, was not a request for counsel).

**b. Right to Remain Silent**

 "[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his right to cut off questioning was scrupulously honored." *Weeks v. Angelone,* 176 F.3d 249, 267 (4th Cir.1999) (quoting *Michigan v. Mosley,* 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975)) (internal quotations omitted). In determining whether the detectives scrupulously honored Pettiford's decision to remain silent, the Court must consider the following factors:

(1) whether the police had given [Pettiford] *Miranda* warnings at the first interrogation and [he] acknowledged that he understood the warnings; (2) whether the police immediately ceased the interrogation when [Pettiford] indicated that he did not want to answer ques-

tions; (3) whether the police resumed questioning [Pettiford] only after the passage of a significant period of time; (4) whether the police provided a fresh set of *Miranda* warnings before the second interrogation; and (5) whether the second interrogation was restricted to a crime that had not been a subject of the earlier interrogation.

*Weeks,* 176 F.3d at 267. The law does not provide a bright-line test; rather, "the touchstone is whether a 'review of the circumstances' leading up to the suspect's confession reveals that his 'right to cut off questioning was fully respected.'" *Id.* at 268 (quoting *Mosley,* 423 U.S. at 104, 96 S.Ct. 321). Thus, failure to satisfy certain factors is not dispositive. Applying the factors to the instant case, the Court finds that the detectives scrupulously honored Pettiford's right to remain silent.

The first and second factors are satisfied. It is undisputed that the detectives read Pettiford his *Miranda* rights during the first interrogation, that Pettiford acknowledged in writing that he understood those rights, and that the detectives immediately terminated the interview when Pettiford invoked his right to remain silent.

 The third factor asks whether the detectives waited a significant period of time after Pettiford invoked his right to remain silent before questioning him again. To be significant, the interval between interrogations need not last a certain period of time. Rather, a "significant period of time" is "a function of to what degree the police 'persist[ed] in repeated efforts to wear down [the suspect's] resistance and make him change his mind.'" *Id.* (quoting *Mosley,* 423 U.S. at 105–06, 96 S.Ct. 321). After terminating the first interview, the detectives waited approximately one hour before resuming questioning of Pettiford. There is no credible evidence that during this one-hour interval, the police engaged in any acts calcu-

lated to wear down Pettiford's resistance and force him to change his mind. Accordingly, the Court finds that the detectives waited a significant interval before resuming questioning.[16]

The fourth factor is whether the detectives provided Pettiford with a fresh set of *Miranda* warnings before the second interrogation. Before reading Pettiford his *Miranda* rights a second time, Detective Jenkins (i) obtained possession of the gun that officers found in the glove compartment of Pettiford's car; and (ii) initiated the second interview by entering the interview room, showing Pettiford the gun, and asking Pettiford if he recognized it. It was only after showing Pettiford the recently discovered gun and asking him a pointed question, *i.e.*, whether he recognized the gun, that Pettiford said he wanted to make a statement and Detective Jenkins read Pettiford his *Miranda* rights a second time. After countersigning a *Miranda* form and waiver, Pettiford confessed to the shooting.

Technically, Detective Jenkins initiated the second round of questioning before reading Pettiford his rights a second time. The Court, however, does not consider this technical point significant because Pettiford was fully re-Mirandized before he provided any incriminating statements. Moreover, it is doubtful that Pettiford had forgotten his rights during the one-hour interval. He was, therefore, still aware of his rights when Detective Jenkins initiated questioning by asking him about the gun. In addition, the fact that Pettiford provided his statement to Detective Jenkins, who was present when Pettiford previously invoked his right to remain silent, demonstrates that he was comfortable exercising his right and that the decision to later waive it was voluntary and not the product of coercion. *See id.* at 268–69. Thus, although Detective Jenkins initiated questioning before reading the second *Miranda* warnings, this does not render Pettiford's statements inadmissible.

■■ The fifth factor is whether the second interrogation concerned a crime that was the subject of the first interrogation. In this case, both interrogations concerned the "road rage" shooting. However, during the second interrogation, Detective Jenkins showed Pettiford the gun that the police had recently recovered from Pettiford's car. Based upon the testimony from the hearing, and after weighing the credibility of the witnesses, the Court finds that Detective Jenkins did not show Pettiford the gun in an effort to coerce a confession from a reluctant Pettiford. Rather, the Court finds that the detectives presented Pettiford with the gun in a non-coercive manner to determine whether Pettiford might wish to change his mind about making a statement in light of the fact that the police had recovered the gun from his car.[17] Moreover,

16. In *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), the Supreme Court found that an interval of two hours was a "significant period of time." *Id.* at 104–06, 96 S.Ct. 321. The Court, however, has located only one reported case in which the interval was less than two hours, and, in that case, the defendant himself initiated the second round of questioning. *See United States v. Nash*, 910 F.2d 749, 752 (11th Cir. 1990). The lack of readily available precedent in which the interval lasted less than two hours, however, does not alter the Court's conclusion that the detectives in this case

waited a significant interval before resuming questioning. In light of the non-coercive atmosphere in which Pettiford was questioned, an hour-long interval provided Pettiford ample opportunity to reconsider his earlier silence. Moreover, as previously stated, no minimal interval is required.

17. Certainly, the police might seek to use the shock value of recently obtained evidence to overcome a detained suspect's initial reluctance to talk. Conversely, it is not improper for the police in a non-coercive manner to advise a suspect of new information so the

"[w]here other factors indicate that a defendant's right to cut off questioning was 'scrupulously honored,' ... the mere fact that a second interrogation involves the same crime as the first interrogation does not necessarily render a confession derived from the second interrogation unconstitutionally invalid." *Id.* at 269.

Considering the totality of the circumstances in this case, the Court concludes that the detectives scrupulously honored Pettiford's right to end questioning. *See id.* at 267–69 (although, as in the instant case, the fourth and fifth factors were not strictly satisfied, the court found no Fifth Amendment violation).

### c. Voluntary, Knowing and Intelligent Waiver

█ Pettiford further contends that his waiver was not voluntary, knowing or intelligent, and that his statements were not voluntary. The Court disagrees. First, there is no credible evidence in the record that the police coerced Pettiford into waiving his *Miranda* rights or making a statement. Although Pettiford remained in the interview room for four and half hours prior to the first interrogation, he was not handcuffed, he had his cell phone and other personal property, he was permitted to use the bathroom, and he spoke to friends through the interview room door.

Second, Pettiford's waiver was certainly knowing and intelligent. The detectives read the *Miranda* rights to Pettiford on two separate occasions. Each time, Pettiford signed a *Miranda* form stating that

he understood his rights. In fact, Pettiford refused to answer questions during the first interrogation, thus demonstrating that he knew his rights and how to exercise them. Moreover, Pettiford admitted that he had been arrested in the past on numerous occasions and was aware of his rights when the police questioned him about the shooting. *See Burket,* 208 F.3d at 199 (stating that whether a waiver is valid depends on the totality of the circumstances, including the background, experience, and conduct of the suspect). Accordingly, the Court finds that Pettiford's waiver of his rights was voluntary, intelligent, and knowing, and that his statements themselves were voluntary.

Accordingly, the Court rules that the statements Pettiford made to the police after waiving his *Miranda* rights are admissible at trial.

### III. Conclusion

For the foregoing reasons, the Court will, by separate Order, DENY Pettiford's motions to suppress.

---

suspect can revisit his decision to remain silent. In this case, the first and second interrogations were conducted in a non-intimidating setting. Detective Jenkins did not make any statements calculated to overcome Pettiford's reluctance, such as "we have the goods on you now so you had better talk," "time is running out for you to lower your sentence by talking," or the like. At the hearing, Pettiford testified that the police consciously used vari-

ous tactics, including promises of leniency, to overcome his reluctance to talk. Detective Jenkins specifically denied Pettiford's contentions. Having had the opportunity to hear the testimony of Pettiford and Detective Jenkins, the Court credits Detective Jenkins' testimony and finds that the disclosure of the firearm to Pettiford was done in a non-coercive setting.