46 A.3d 1204

**Charles Vernon BORDLEY**

v.

**STATE of Maryland.**

**No. 0464, Sept. Term, 2010.**

Court of Special Appeals of Maryland.

June 27, 2012.

694

696

Celia Anderson Davis (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for Appellant.

Todd W. Hesel (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: KRAUSER, C.J., MATRICCIANI, J. FREDERICK SHARER, (Retired, Specially Assigned), JJ.

SHARER, J.

The prosecution of Charles Vernon Bordley, appellant, stemmed from the discovery of controlled dangerous substances ("CDS") and paraphernalia during a warrantless entry by police into an unoccupied and locked-out hotel room in Grasonville, Queen Anne's County, which had been rented by appellant.

After denying appellant's motion to suppress the evidence seized from Room 118, and statements made by him thereafter, the Circuit Court for Queen Anne's County, in a bench trial (Hon. Thomas G. Ross), convicted appellant of nine drug-related offenses.[1] Appellant challenges those convictions, raising the following issues for our review, which we quote:

I. Did the court err by denying Appellant's motion to suppress evidence?

II. Was the evidence legally insufficient to sustain Appellant's convictions?

We have found no Maryland precedent addressing the constitutionality of a police officer's warrantless entry of a locked-out hotel room at the request of the hotel staff. Nor have we been directed to a case deciding whether hotel management may consent to a warrantless entry and search of a room that it locked out for security reasons involving someone other than the registered guest. Applying Fourth Amendment jurisprudence, we conclude that the circuit court

---

1. The trial court found appellant guilty of possessing heroin, cocaine, marijuana, and Oxycodone (Counts 2, 4, 5, and 10) and of possession with intent to distribute each of those controlled dangerous substances (Counts 1, 3, and 9), and possession of packaging material with the intent to use it in the distribution of CDS (Count 6). In addition, the court found appellant guilty of conspiring with Sidney Floyd Roy to distribute heroin, cocaine, and narcotic drugs (Count 8). After merging the possession offenses into the possession with intent to distribute offenses for sentencing purposes, the court sentenced appellant to a total of sixty years with all but ten years suspended, plus five years of supervised probation.

did not err in denying appellant's motion to suppress because the hotel asserted control over the room for valid and legitimate security reasons after appellant advised that he was no longer occupying it, so that appellant did not have a subjective expectation of privacy and the hotel could consent to the warrantless entry and search. In addition, we conclude that there was sufficient evidence to establish that appellant constructively possessed the CDS and paraphernalia found in his hotel room, and therefore to convict him of possession, possession with intent to distribute, and conspiracy offenses based on such possession.

To develop the factual history, we shall separately review the records of the suppression hearing and the trial.

## FACTS and LEGAL PROCEEDINGS

Before trial, appellant moved to suppress the tangible evidence seized from Room 118 as well as statements made by him to police. The circuit court denied that motion and then convicted appellant based on such evidence.

### Suppression Hearing

Appellant testified in support of his motion and also presented the testimony of his mother, who was the night auditor on duty at the Kent Island area Sleep Inn on August 31–September 1, 2009. Barbara Bordley recounted that while she was alone at the front desk that evening, a short African American man whom she had never seen before came into the hotel talking on a cell phone and "was looking ... around, ... surveying the property." When she offered help, the man asked, " 'May I go to my room?' " Thinking that was unusual for a hotel guest, Ms. Bordley asked his name so she could check it against the list of registered guests. In response, the man "just walked out the door" back into the parking lot.

Because she "was a little uncomfortable," Ms. Bordley "locked the door and ... started looking at the video monitor." She observed the same man walk around to the back door, and shortly thereafter she saw him inside the hotel in the company of a "real tall person." The two men "were up

and down the hallway" until they finally went into a room. Although Ms. Bordley could not see the specific room, she knew it had to be one of "two or three rooms that are . . . blocked together." She "looked at the in house list," which identified "who's in the hotel . . . by room number." According to Ms. Bordley, "in that area there were several vacant rooms and then there was room # 118 which was the room that was in [her] son's name."

Ms. Bordley testified that she knew that "room # 118 [was] occupied" but that her son "wasn't in the room because [she] left him home" with his daughter when she left for work that evening.[2] After observing the two men in the hallway, Ms. Bordley called home and talked with appellant, telling him, "now I don't know whether it's your room or what but there is activity in the hallway and I'm going to lock out the room."

She continued, "In the meantime, these guys were back up and down in the hallway" and eventually "went out the back door[.]" At that point, Ms. Bordley telephoned the hotel owner, because she "was afraid" that the hotel was "going to be robbed." According to Ms. Bordley, the owner "said that if at any time you are feeling uncomfortable, call the police, which is normal." But Ms. Bordley did not do so right away. Instead, while the two men were outside, she made a new key card and put it in the door lock, thereby invalidating the key cards that previously had been issued to appellant so that they would no longer open Room 118 or the back door to the hotel.

Unable to enter the back door, the two men in the parking lot returned to the front door and "starting beating on the glass[.]" Ms. Bordley again called the owner, who reiterated his advice to use her discretion and "to call the police if she was uncomfortable." She called 911, asking "would [police] secure the . . . hotel parking lot because there was unusual

---

2. Appellant had been living with Ms. Bordley "[s]ince the death of his wife," "because the two of [them] watch[ed] his daughter." Although Ms. Bordley did not know why appellant had a room at the hotel, she testified that "[h]e may have had a girlfriend," and she did not "allow that in [her] house."

traffic in the parking lot at that point." She then hid under a desk in the office until the police arrived.

Two police officers responded and reported that there was no one in the parking lot. Ms. Bordley recounted to them the events that prompted her to call 911. She told them that she believed the two men had gone into Room 118, "[b]ased on the fact that there were no occupancies in and around that same area where these two men were walking." She claimed that she only "asked [the officers] to secure the parking lot . . . and the hallway" and denied telling the officers that "room 118 wasn't to have anyone in it because it was only rented for one day," or asking them to enter the room and clear anyone out "because no one was allowed to be in the room." Differing from the officers' testimony, Ms. Bordley insisted that she told the officers that the room was rented, and that they went to the room then "came back and asked for a key," which she provided.

Appellant testified that he rented Room 118 at the Sleep Inn for the nights of August 30 and 31, 2009. He explained that he was home with his daughter on the evening of August 31, until his "distraught" mother "called the house between like 11:00 and 12 o'clock." As a result of her call, appellant phoned a relative to come stay with his daughter, and he went to the Sleep Inn with his friend Sidney Roy, arriving about 45 minutes after his mother called. According to appellant's account, he and Roy went into the hotel through the back door and proceeded down the hall toward Room 118 because Ms. Bordley told him that he "needed to take care of" his room due to "the activity there." Police officers stopped them in the hallway, saying that they "fit the description" of the two men seen by Ms. Bordley.

Appellant explained that he was "letting other people use" the room, that those people had both of the room keys that had been issued to him, that he never entered the room, and that he did not "know what was in the room." In addition, he denied telling his mother that there was not supposed to be

anyone in the room and denied that after she called him, he came to the hotel "to correct ... drug activity in there[.]"

Queen Anne's County Sheriff's Deputy Christopher Schwink testified that Ms. Bordley told him and Deputy Jason Rickard "that there was some gentlem[e]n trying to gain access to the hotel through the rear entry door, and that she had seen them going in and out of room 118 earlier in the evening and nobody was suppose[d] to be in that room because it was not paid for." The officers knocked on the door of Room 118 and got no answer. According to Schwink, Ms. Bordley then "made a copy of the room key" and "[t]old [them] to go in and make sure nobody was in the room. If anybody was in the room, they were to leave, because the room was not paid for."

Schwink said that the officers found no one in the room, but "[a]s soon as [they] entered the room" they "found contraband laying throughout the room." On the top of the dresser in plain view were what Schwink, based on his experience and training, believed to be "marijuana, cocaine, heroin, smoking devices, scales and bags." Specifically, he "saw a small bag full of glassine baggies, a white rock, later identified and tested as cocaine, two small bags of greenish vegetable substance" that he "recognized ... to be marijuana," "a piece of brown paper that had a line of brown powder which was tested and proven to be heroin, and then a smoking devi[c]e made out of an airplane ... liquor bottle." In addition, next to the suspected heroin, there was a scale with "traces of a brown powder," which indicated that it had been used "to measure different amounts of heroin for purposes of sale." Although Schwink also saw "a checkbook on the bed," "it was left there at that time."

Deputy Rickard stayed in the room while Schwink went "to notify ... Ms. Bordley" of the discovery. While Schwink was away from the room, "two individuals came through the back door of the hotel," and Rickard "made contact with them. They saw him in the room and tried to elude him [by] running down the hallway." The officers stopped the two men, and both claimed "that they knew nothing about the room." How-

ever, when Schwink returned to the room to "run their I.D.'s, he "picked up the checkbook and noticed it had the same name . . . as the one subject's name [he] was running, Mr. Bordley." Both men were detained but continued to deny "any knowledge of the room" and, instead, "advised that they were going to meet a girl on the second floor." While these events were taking place, Ms. Bordley "had left and a new night clerk/manager had arrived[.]"

The hotel owner and manager, Neelish Patel, gave Schwink "a copy of the sales receipt," which "showed that the room was rented to Mr. Bordley." In addition, Patel provided the officers with "a copy of the video in the hotel," from which Schwink "could see the two individuals and a third individual who[m][he] was unable to identify, come through the rear door of the hotel[.]" Schwink described what was portrayed on the video: the two men who were detained, identified as appellant and Roy, "walked down towards the hotel room, saw Deputy Rickard, and you see them make movements to try to get away from that hotel room. One of them threw a key card" that "landed in front of room 119." Based on the video, Schwink recovered a key card from that location. Patel "checked the card and said that it was no longer a valid card," and therefore it could not be identified as having previously been issued to a particular room.

Patel accompanied the officers to Room 118 and authorized another search in order to "to make sure that there was nothing hidden anywhere else." In the process, he told the officers that "the room was not paid for for the date of September 1st so nobody should have been in the room." In addition to the contraband previously listed, this search yielded from the refrigerator a baggie containing a white powder substance. Initial field tests indicated it might be cocaine, but ultimately it tested negative for CDS.

Corporal Tyson Brice, who was assigned to the Maryland State Police Drug Enforcement Division Queen Anne's County Task Force, testified that at approximately 1:00 p.m. on September 1, 2009, he received a call from the Queen Anne's

County Sheriff's Office that additional CDS was found in Room 118 of the Sleep Inn. When Corporal Brice responded to the hotel, John Shagen, the hotel maintenance man, advised that he had been called upon to open the room safe because the key was missing. "And, when he opened the safe, he saw what he believed were controlled dangerous substances inside the safe and that's why he called" the Sheriff's Office. Brice went to the room with Shagen and Patel, then collected from the already open safe what he immediately recognized as "Oxycontin and heroin."

At the conclusion of this testimony, the court denied appellant's motion to suppress, ruling that appellant did not have an expectation of privacy because he claimed that he had "never been in the room" and Ms. Bordley justifiably locked out the room for reasons of security and gave police authority to enter it.

### Trial

At trial, Deputy Rickard, who did not testify at the suppression hearing, gave an account of the officers' encounter with Ms. Bordley and the search of Room 118 that was substantively consistent with Schwink's suppression hearing testimony. Rickard testified, *inter alia,* that Ms. Bordley told the officers that "the room wasn't rented to anybody at the time" and "that she was given permission by the general manager of the hotel to issue a key to [the deputies] . . . and to clear the room and to secure it, and if there was anybody in the room, to advise them that they were not suppose[d] to be in the room at the time."

About ten minutes after Schwink left to notify the hotel of their discovery, while Rickard remained outside the room to secure it, Schwink observed appellant and Roy "swipe" a key card and enter the back door. As the two approached Room 118, Rickard stepped out into the hallway to ask them which room they were going to. Upon seeing the deputy, the two men reversed direction and "tried to run back out of the door they came in." With Schwink's assistance, appellant and Roy were detained. Appellant and Roy told Rickard "that they

were just there visiting a friend, that they were not guests of the hotel at any time." When the deputy asked how they were able to get into the hotel, they claimed that "somebody opened the door for them." At that point, Schwink found a key card laying on the floor outside Room 119, which was the area where Rickard had stopped appellant and Roy.

Schwink's trial testimony was also consistent with his suppression hearing testimony and Rickard's trial testimony. Schwink recounted that Barbara Bordley "advised that she had seen two ... suspicious males trying to get into the building" and "[b]elieved they were staying in room 118," although "[t]here was nobody to be in that room." Appellant and Roy initially told Schwink that "they were not staying in any room in the hotel, had no connections with any room in the hotel, and were here to see a female friend but [were] unsure of what room she was in." Both men "had bags of food, groceries, milk[.]"

After Schwink advised appellant that a checkbook found on the bed in Room 118 bore his name, appellant "stated ... that he hadn't seen his checkbook in several days." Later, when Schwink became aware that appellant had rented the room, he showed appellant a hotel receipt, and appellant "advised ... that he did rent the room but had never been in the room. He rented it for somebody else." Following his arrest, appellant made a written statement to that effect, and the statement was admitted into evidence.

John Shagen, Sr., the maintenance worker at the Sleep Inn, testified that on September 1, 2009, he let a police detective into Room 118. Because the key to the safe in that room was missing, Shagen obtained a master key from the hotel manager and opened the safe.

Corporal Brice testified that after being called to the Sleep Inn around 1:00 p.m. on September 1, 2009, he seized the contents of the safe in Room 118, which was later determined to be 50 Oxycodone/Tylenol pills, a plastic bag containing 6.9 grams of heroin, a razor blade, and several unused plastic ziploc bags. According to Brice, who was qualified as an

expert in CDS distribution and packaging, these quantities of CDS and the presence of a scale, razor blade, and packaging materials indicated an intent to distribute.

Barbara Bordley and appellant testified in the defense case. Ms. Bordley expanded her account of the events preceding her 911 call, explaining that she saw, via the security surveillance cameras, the first man, a shorter Afro–American with dreadlocks, exit Room 118 in the company of a "very tall" and "robust" dark-skinned Afro–American man. The two men walked up and down the hallway before returning to the room, and "this proceeded to happen two or three times."

Ms. Bordley called her son at home to tell him that she was frightened that the "hotel is getting ready to be robbed" and that the suspicious activity was " 'in the area where the room that [he] rented is.' " Appellant responded, " 'Well, that room should be vacant, Mom.' " After that, Ms. Bordley left the hotel, drove to her nearby home (approximately five minutes away), and saw appellant there. After she told appellant how scared she was, he advised her "to go back and call the police."

Ms. Bordley then returned to the hotel and observed the two men exit Room 118 and go out the back door. At that point, she called the hotel owner, got permission from him to "lock out the door that was the room that [her] son was registered in," and then went to the room and changed the lock. She watched the surveillance camera as the two men came back around to the locked front door and "started shaking the door really, really hard." At that point, she "became traumatized" and again called the hotel owner/manager, "who then gave [her] permission to call the police." After she called 911, she hid in the office under a desk with two phones, "calling home for help because [she was] afraid."

When police arrived, Ms. Bordley told them Room 118 was not supposed to be occupied and that "no one was renting the room anymore" because "that's what my son had said." Although appellant told her that he " 'had rented the room,' " he did not "know why his name was still on the register" and

insisted that Room 118 "was only rented for the one night." Ms. Bordley explained that when she testified in the suppression hearing, she believed that he had rented the room for the second night based on the hotel register and a hotel receipt that appellant later "said was no good." She could not recall whether it was she or the hotel owner who provided key cards to the officers. With the owner's permission, she left the hotel because she was "unnerved." She did not learn that her son had been arrested until 8:30 or 9:00 a.m.

Appellant testified that he rented a room at the Sleep Inn for Vaughn Watson, somebody he knew from the "neighborhood," as "a favor" because Watson did not have an identification card. Watson gave appellant the cash that appellant used to pay for the room Sunday night, and appellant gave him both room keys. Appellant never spoke to Watson after he rented the room.

When his mother first called around 11:00 p.m. on Monday night, asking about his name on the hotel registry, he told her he rented the room but did not tell her why. Before she returned to the hotel, "she said she was going to . . . call the police" because "the activity was getting greater and greater." Appellant told her that she should do so if she felt uncomfortable and believed that "something is going to happen." After his mother left, appellant arranged for house guests to watch his daughter and drove to the hotel by himself "[t]o see what . . . was going on" because his name was showing on the hotel register. He entered through the back door instead of the front door because "there was like activity in there and . . . in the parking lot" and "the back door was open." Sidney Roy, whom appellant knew from the community, was walking "in front" of him in the building, but they "weren't together."

Appellant denied having a key card or running when he saw a police officer. He claimed that he had his checkbook in his pocket when he arrived at the hotel and that a police officer took it from him while he was detained in the hallway. Although Roy told the officers he was there to see a female friend, appellant denied making that comment. He claimed

that he did not tell police that he was there to check on his mother who works there because "they never asked ... any question ... like that[.]" He denied knowing "anything that was going on in that room from any of the people in the neighborhood" or any other knowledge of what was in the room.

We shall add facts as they pertain to our discussion of the issues raised by appellant.

## DISCUSSION

### I.

### Motion to Suppress

■ Appellant argues that "[t]he hearing court should have granted the motion to suppress evidence removed from room 118 in the Sleep Inn because [a]ppellant had rented the room, had a reasonable expectation of privacy in it, and the entry into the room by law enforcement officers was not permissible." [3] The State responds that the evidence supports the motion court's conclusions that appellant did not have a reasonable expectation of privacy and that the hotel consented to the officers' warrantless entry and search.

■ In reviewing the denial of a motion to suppress, appellate courts consider only the evidence presented at the suppression hearing and "extend great deference to the fact finding of the suppression hearing judge[.]" *Briscoe v. State,* 422 Md. 384, 396 (2011). We review the motion court's factual findings, including its credibility determinations, for clear

---

3. In his brief, appellant also "seeks review" of the suppression court's findings that "(1) the testimony of the law enforcement officers was credible, (2) Barbara Bordley's testimony was tainted by bias, ... and (5) that the maintenance worker who found drugs in the room safe was not a State agent[.]" As the State points out, however, appellant's brief does not contain further argument regarding these determinations. Because "[a]rguments not presented in a brief or not presented with particularity will not be considered on appeal," *Diallo v. State,* 413 Md. 678, 893, 994 A.2d 820 (2010), we shall accept those findings for purposes of our independent constitutional appraisal.

error, then review *de novo* the legal conclusion that the warrantless entry, search, and seizure was constitutionally permissible by applying the law to those facts. *Id.; Williams v. State*, 372 Md. 386, 401, 813 A.2d 231 (2002).

"The Fourth Amendment to the United States Constitution, made applicable to the State through the adoption of the Fourteenth Amendment, guarantees the people's right 'to be secure in their houses . . . against unreasonable searches and seizures.'" *Laney v. State*, 379 Md. 522, 545, 842 A.2d 773 (2004). Because this constitutional protection arises only if the individual has a reasonable expectation of privacy in the searched premises, "[t]he one invoking the Fourth Amendment protection bears the burden of demonstrating his or her legitimate expectation[,] of privacy in the placed searched[.]" *Id.* "The burden consists of two inquiries: (1) whether the individual has a subjective expectation that his or her property . . . will not be searched, and (2) whether the expectation is objectively reasonable under the circumstances." *Id.*

Although "'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed[,]' [a] motel room can be protected by the Fourth Amendment as much as a home or an office." *Williams*, 372 Md. at 402, 813 A.2d 231 (citing *Hoffa v. United States*, 385 U.S. 293, 301, 87 S.Ct. 408, 413, 17 L.Ed.2d 374 (1966); *Stoner v. California*, 376 U.S. 483, 490, 84 S.Ct. 889, 893, 11 L.Ed.2d 856 (1964); *United States v. Jeffers*, 342 U.S. 48, 51–52, 72 S.Ct. 93, 95, 96 L.Ed. 59 (1951)). *See also Gross v. State*, 235 Md. 429, 439, 201 A.2d 808 (1964) ("it is well-established law that a person's hotel room is protected against unreasonable searches").

Nevertheless, courts have recognized that a hotel guest's "privacy rights and reasonable expectation of privacy are limited by the unique and transient nature of his room occupancy." *Massachusetts v. Molina*, 459 Mass. 819, 948 N.E.2d 402, 408 (2011). Whereas during his or her stay, "a hotel guest customarily has no reason to expect the manager to allow anyone but his own employees into his room[,]"

*Georgia v. Randolph,* 547 U.S. 103, 112, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006), that "guest's reasonable expectation of privacy expires completely when the rental contract lapses," *Laney,* 379 Md. at 548, 842 A.2d 773, so that hotel staff may enter a room, lock it out, and/or authorize police to enter it based on non-payment of hotel charges. *See, e.g., United States v. Kitchens,* 114 F.3d 29, 31–32 (4th Cir.1997) ("Generally, a guest does not have a reasonable expectation of privacy in his hotel room after his rental period has terminated" unless the hotel has a pattern and practice of accepting late check out or payment); *United States v. Huffhines,* 967 F.2d 314, 318 (9th Cir.1992) (hotel room search conducted with the valid consent of hotel management falls within exception to the warrant requirement). *See generally In re Tariq A–R–Y,* 347 Md. 484, 490–91, 701 A.2d 691 (1997) ("A permissive search pursuant to voluntary consent is one ... limited exception" to the warrant requirement for hotel searches because "the individual whose right it is to be free from unreasonable searches and seizures may waive Fourth Amendment protection."). Similarly, a hotel may justifiably evict a guest as a result of misconduct or illegal activity, thereby extinguishing his or her expectation of privacy. *See, e.g., Molina,* 948 N.E.2d at 408–09 (collecting federal and state cases); *New York v. Hardy,* 77 A.D.3d 133, 907 N.Y.S.2d 244 (2010) (same), *appeal denied,* 16 N.Y.3d 743, 917 N.Y.S.2d 625, 942 N.E.2d 1050 (2011).

For example, in the frequently cited case of *United States v. Allen,* 106 F.3d 695, 699 (6th Cir.1997), the defendant guest failed to increase his credit balance as required by the motel. The motel manager used a pass key to enter the unoccupied room in order to determine whether the defendant "had skipped without paying." *Id.* at 697. After observing large quantities of marijuana in plain sight, the manager "used a separate key to engage the 'lock-out,' a deadbolt lock only she could open." *Id.* The manager then called police and opened the room for responding officers. *Id.*

The Sixth Circuit rejected the defense contention that this warrantless entry violated the Fourth Amendment, reasoning

that "a hotel guest's use of a room for illegal purposes, and beyond the pre-paid rental period vitiates the guest's reasonable expectation of privacy." *Id.* at 699. As long as the motel had a "valid and legitimate" reason for terminating the tenancy, "[t]he manager's consent to the officers' search of the room was all that was required to avoid constitutional infirmity." *Id.* (footnote omitted). Thus, "[o]nce a manager, through private action, took possession of the motel room," the defendant guest "could no longer assert a legitimate privacy interest in its contents." *Id.*

Although we found no Maryland precedent considering the warrantless entry of a locked-out hotel room at the request of hotel management,[4] we conclude that here, as in *Allen,* the legality of the hotel's consent depends upon whether the hotel locked out the room for a "valid and legitimate reason." *See id.* In answering that question, however, we recognize that the Sleep Inn's asserted reason for locking out Room 118 was not non-payment or misconduct by the registered guest, but rather to safeguard hotel employees and guests.[5]

---

**4.** Although the Court of Appeals generally discussed hotel searches in *Laney,* 379 Md. at 550, 842 A.2d 773, that case involved the warrantless entry of a trespassing defendant's former residence, at the request of the buyer in foreclosure. *Brown v. State,* 378 Md. 355, 835 A.2d 1208 (2003); *Scott v. State,* 366 Md. 121, 782 A.2d 862 (2001); and *Perkins v. State,* 83 Md.App. 341, 574 A.2d 356 (1990), are not instructive because they involved "knock and talk" entries of motel rooms with the occupant's consent. Likewise, there were no warrantless entries into unoccupied and locked out hotel rooms at the request of hotel management in *Williams v. State,* 372 Md. 386, 813 A.2d 231 (2002) (police with an arrest warrant broke into defendant's occupied motel room); *Gross v. State,* 235 Md. 429, 442, 201 A.2d 808 (1964) (hotel manager's wife opened defendant's unoccupied hotel room for investigating police officers following defendant's arrest for murder of another hotel guest); or *Berigan v. State,* 2 Md.App. 666, 670, 236 A.2d 743 (1968) (police officers executing arrest warrant accompanied hotel clerk when he used pass key to enter defendant's occupied room).

**5.** There was conflict in the evidence, based on the testimony and Sleep Inn records, as to whether appellant had booked the room for one night or two and, further, whether rental had been paid for both nights.

After reviewing the evidence, the suppression court conclud-
ed that appellant did not have an expectation of privacy in
Room 118 given that appellant advised that he was not occupy-
ing the room and the hotel thereafter locked it out for
legitimate security reasons. The court reasoned that

> in terms of witness testimony, the officers, both of them
> were credible. My concern with Ms. Bordley's testimony is
> that I think that it's tainted to a certain extent with her
> bias. She clearly has a bias in favor of her son. She thinks
> she's helping him by providing him with a certain amount of
> standing, if you will. Although, as I have already indicated,
> I think there is enough evidence to show that he may have
> rented this room. But, through his own testimony to the
> Court, he has no reasonable expectation of privacy. He's
> never been in the room. He has nothing in the room.
> That's what he's testified about so how can he have any
> reasonable expectation of privacy.
>
> But we can go on from there. And on from there is ...
> that Ms. Bordley was rightfully concerned because she had
> seen two people that had no business being there. She
> knew they had not rented anything. She was concerned
> about robberies, and consequently what she did is exactly
> what you'd do when somebody is not allowed to be in the
> room or their time has expired. She canceled out the card
> for room 118 because she was concerned about what was
> going on there. She knew her son wasn't in there because
> he was at home.... So consequently, she blocked that out
> so that no one else would have access to room 118 or the
> back door. And in fact, Mr. Bordley ... would have to
> come to the front ... whether she was there or somebody
> else was there, and provide the information to show that he
> was the proper renter to get a card to get back in there.
> That was done for the safety of the entire establishment.
> This is a hotel after all. There are other people staying so
> it's for the safety of everybody in there, including herself.

---

Because the suppression court made no factual finding on that ques-
tion, it is not before us.

It's also for the safety of who ever's suppose[d] to properly occupy room 118, who is Mr. Bordley.... [W]hen these people were knocking on the front door, that's when she called the police and the police came and she explained the situation to them. She explained that nobody can get into that room at this point. She wasn't sure what was going on in that room. She gave them the authority to enter the room.... This is what hotel keepers can do ... when they are concerned about safety issues, they lock ... anybody [out] of ... that room. I find that there's clearly authority for what Ms. Bordley did. She's ... in charge and she gave them the ability to go in.

The evidence supports Judge Ross's factual finding that, after appellant advised that he no longer occupied Room 118, the hotel staff locked out the room to prevent access to both the hotel and Room 118 as a security measure to protect hotel guests and employees. Ms. Bordley testified that she became concerned about a possible robbery based on the conduct of the two men she saw entering and leaving Room 118. In accordance with hotel policies, and with the express permission of the hotel owner, Ms. Bordley responded to the perceived security threat by locking the front door of the hotel and telephoning appellant, the registered guest, who told her that he was not using the room and that it should not be occupied. In response to that information, Ms. Bordley reprogrammed the lock to prevent re-entry of both Room 118 and the exterior hotel doors with the key cards that had been issued to appellant. Ms. Bordley told appellant that she locked out Room 118 and explained that thereafter, he could not re-enter the room without the hotel issuing a new key card.

When the two men in the parking lot were not able to re-enter the back door of the hotel, they came around to the front door and banged on it in an effort to get someone to let them in. After again talking to the hotel owner, Ms. Bordley called 911 to report her concerns regarding the men who had been in and out of Room 118. She advised the responding officers that the room should not be occupied, gave them a key card,

and asked them to enter the room in order to determine whether it was in use, and if so, to "clear it out." Based on this evidence, the motion court's finding that the hotel locked out Room 118 and consented to the warrantless entry for security reasons was not clearly erroneous.

We have not been directed to any case deciding whether a hotel may lock out a room based on security concerns prompted by someone other than the registered guest, then consent to a warrantless entry of that room by police.[6] We agree with the motion court's conclusion that in the circumstances presented here, the lock-out was a permissible security measure that coincidentally extinguished appellant's expectation of privacy.

■ Although we recognize that Fourth Amendment protections for hotel guests cannot "depend upon the unfettered discretion" of hotel employees, see *Stoner*, 376 U.S. at 490, 84 S.Ct. 889, the suppression record here established that the hotel acted reasonably in locking out Room 118 and asking police to enter the room after appellant advised that he was no longer occupying it. In fact, the suppression court founded its ruling on the justification of the "lock-out" for security reasons that coincidentally extinguished appellant's subjective expectation of privacy, rather than on appellant's argument that he had an objectively reasonable expectation of privacy. The behavior of two individuals who were neither registered guests nor authorized guests of the registered guest for Room 118 caused Ms. Bordley to fear for her own safety and the safety of hotel guests. Once appellant told her that he was no longer using the room and that the room should not be occupied, Ms.

---

6. For a recent discussion of other specialized Fourth Amendment issues involving hotel rooms, see Jason C. Miller, *Do Not Disturb: Fourth Amendment Expectations of Privacy in Hotel Rooms*, 7 Seton Hall Cir. Rev. 269 (2011) (analyzing "some distinct problems faced in hotel rooms, including invalid registrations, guests of guests, and guests who stay beyond the rental period"). *See also* M.C. Dransfield, *Transiently Occupied Room in Hotel, Motel, or Roominghouse as Within Provision Forbidding Unreasonable Searches and Seizures*, 86 A.L.R.2d 984 (collecting Fourth Amendment hotel cases).

Bordley, pursuant to hotel policy as confirmed by the hotel owner, had authority to change the door lock. After appellant's key cards for Room 118 were cancelled, possession of the room reverted to the hotel because appellant could not re-enter the room without the hotel's permission. Thereafter, it was reasonable for Ms. Bordley, who was the lone hotel employee on duty that night, to request that police enter the locked-out room rather than entering it herself.

The security concerns raised by the unauthorized users of Room 118, appellant's advice that he was no longer using the room and that it should not be occupied, and the notice of the lock-out provided to appellant by the hotel, materially distinguish this case from *United States v. Young*, 573 F.3d 711, 716–17 (9th Cir.2009). Although *Young* was decided on the question of Young's reasonable expectation of privacy, and not on a security "lock-out" that extinguished the guest's subjective expectation of privacy, the Court's opinion is instructive. A hotel employee mistakenly gave Young, a registered guest, a key to another guest's room. After property went missing from the guest's room, the hotel's error was discovered. Although Young agreed to talk with hotel security personnel, he was not in his room when they arrived. A hotel security employee then entered Young's room and searched his luggage for the missing property. Upon discovering a firearm and checkbooks in the name of other persons, hotel security employees locked out Young's room without notifying him. After Young returned to the hotel and found he could not enter his room, hotel security called police, who then interviewed Young in the lobby and learned that he had been to prison. Accompanied by a police officer, a hotel security employee again unlocked Young's room and opened his luggage, revealing the weapon to the officer.

Young was charged as a felon in unlawful possession of a firearm, but the federal district court suppressed the evidence recovered from his hotel room. Affirming that decision, the Ninth Circuit explained that Young

maintained a reasonable ... expectation of privacy in his hotel room and the luggage he left in the hotel room,

because hotel staff had not evicted him from the room. The hotel had not taken any affirmative act that was a clear and unambiguous sign of eviction. Upon returning to his room and seeing that his key did not work, Young might reasonably have believed his key to be defective or demagnetized, rather than suspecting that he had been evicted from the room.

*Id.* Among the critical facts that "militate[d] against a factual finding that Young had been evicted from his room" was that "Young was never told by any member of the Hilton security staff that he had been evicted." *Id.* at 717.

In contrast to Young, appellant understood, as a result of his conversations with Ms. Bordley, that the hotel had terminated his right to exclusively occupy Room 118. Because the hotel locked out Room 118 for a valid and legitimate security reason, as we have reviewed, the hotel staff reasonably authorized the police to enter the room without a warrant. The circuit court therefore did not err in denying appellant's motion to suppress.

## II.

### Sufficiency of the Evidence

Appellant argues that the evidence was legally insufficient "to establish that [he] possessed the illegal drugs and paraphernalia found in room 118, that he had knowledge of them, or that he conspired with Sidney Roy to distribute the drugs."

Our task in reviewing the sufficiency of evidence is to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *see Smith v. State,* 415 Md. 174, 184, 999 A.2d 986 (2010). "If the evidence 'either showed directly, or circumstantially, or supported a rational inference of facts which could fairly convince a trier of fact of the defendant's guilt of the offenses charged beyond a reason-

able doubt[,]' then we will affirm the conviction." *Bible v. State,* 411 Md. 138, 156, 982 A.2d 348 (2009) (quoting *State v. Stanley,* 351 Md. 733, 750, 720 A.2d 323 (1998)). "Because the fact-finder possesses the unique opportunity to view the evidence and to observe first-hand the demeanor and to assess the credibility of witnesses during their live testimony, we do not re-weigh the credibility of witnesses or attempt to resolve any conflicts in the evidence." *Smith,* 415 Md. at 185, 999 A.2d 986. Instead, "[w]e defer to the [fact-finder's] inferences and determine whether they are supported by the evidence." *Id.*

In Maryland, possession of CDS and possession of CDS and paraphernalia with intent to distribute are statutory offenses. *See generally* Md.Code (2002, 2012 Repl.Vol.), § 5–601(a)(1) of the Criminal Law Article ("Crim.") ("a person may not . . . possess . . . a controlled dangerous substance"); Crim. § 5–602(2) ("a person may not . . . possess a controlled dangerous substance in sufficient quantity reasonably to indicate under all circumstances an intent to distribute or dispense a controlled dangerous substance"). Conspiracy to distribute CDS is a common law crime. *See, e.g., Rudder v. State,* 181 Md.App. 426, 434, 956 A.2d 791 (2008) (conspiracy is a common law misdemeanor); Crim. § 1–202 ("The punishment of a person who is convicted of conspiracy may not exceed the maximum punishment for the crime that the person conspired to commit."); Crim. § 5–602(1) ("a person may not . . . distribute or dispense a controlled dangerous substance").

Possession, which is a common element in each of these statutory offenses, is defined to "mean exercise [of] actual or constructive dominion or control over a thing by one or more persons." Crim. § 5–101(u). As the Court of Appeals has explained,

[i]nherent in the element of exercising dominion and control is the requirement that the defendant knew that the substance was a CDS. Knowledge is a required element because "an individual ordinarily would not be deemed to exercise 'dominion or control' over an object about which he

is unaware." "[K]nowledge may be proven by circumstantial evidence and by inferences drawn therefrom."

*Smith,* 415 Md. at 187, 999 A.2d 986 (citations omitted). Moreover, " '[i]t has long been established that the mere fact that the contraband is not found on the defendant's person does not necessarily preclude an inference by the trier of fact that the defendant had possession of the contraband.' " *Id.* (citation omitted). Therefore, "possession may be 'actual or constructive ... and the possession may be either exclusive or joint in nature.' " *Id.* (citation omitted). "A person has constructive possession over contraband when he or she has dominion or control over the contraband itself or over the premises ... in which it was concealed." *Neal v. State,* 191 Md.App. 297, 316, 991 A.2d 159, *cert. denied,* 415 Md. 42, 997 A.2d 792 (2010).

Although "possession is determined by examining the facts and circumstances of each case," the Court of Appeals has

> found several factors to be relevant in the determination of whether an individual was in possession of the CDS, including, the defendant's proximity to the drugs, whether the drugs were in plain view of and/or accessible to the defendant, whether there was indicia of mutual use and enjoyment of the drugs, and whether the defendant has an ownership or possessory interest in the location where the police discovered the drugs. None of these factors are, in and of themselves, conclusive evidence of possession.

*Smith,* 415 Md. at 198–99, 999 A.2d 986 (citations omitted).

Appellant contends that, based on these factors, "the prosecution failed to adequately prove the drug offenses." In his view, he was "not shown to have possessed the items found in room 118 or to have knowledge of what was in the room" given that appellant was not seen in Room 118, denied using the room, and did not have "actual possession of the room key," whereas there were two other men using the room, neither of whom were identified or linked to appellant. As for the conspiracy charge, appellant contends that "there was no

direct proof of an agreement of any kind between him and Sidney Roy."

The State counters that appellant's insufficiency argument "is based on viewing only those facts most favorable to him, and not the conflicting evidence and the facts as found by the trial court." In the State's view, the evidence "supported the trial court's conclusion that Bordley aided and abetted the possession of the contraband discovered in room 118," based on our reasoning in *Cottman v. State*, 165 Md.App. 679, 698, 886 A.2d 932 (2005), *vacated and remanded on other grounds*, 395 Md. 729, 912 A.2d 620 (2006), that because a person can aid and abet the distribution of CDS, and possession is a necessary element of that crime, then he or she must also be able to aid and abet CDS possession offenses. Alternatively, the State contends that these same facts support a finding that appellant constructively possessed the CDS and paraphernalia.

At the conclusion of this bench trial, Judge Ross concurred with the prosecution theory that appellant was guilty "as an aider and abettor or an accessory in this operation. He's essentially the facilitator." The court made the following findings:

> The evidence, as I see it, is that Mr. Bordley rented this room. There's no question about that. Even he indicates that he rented the room on August 30th. That apparently, it continued at least until the early morning hours of September 1st .... [W]hat's important for me is the way this all developed. Obviously, Mrs. Bordley, when she contacted ... Mr. Bordley, and the police, she was very afraid, concerned. She had seen two individuals in this room. She knew the room was associated with her son. That his reaction to that was, oh, well you go on back, and if you have to, call the police. He doesn't tell her I'm going to come back to the hotel also. I'm going to be with Sidney Roy, and by the way[,] I rented the place to Vaughan Watson who's staying there. None of that. None of that does he indicate to her, even to allay her ... concerns in the matter. So, consequently, I don't find that he's credible in

the least. I think she's credible on a number of points, but the essential point as to what was going on in this room, she had no knowledge of, because that was something her son kept from her. I think what associates him with the room is, A: He's the renter. He indicates that he's never even been in the room, but his checkbook's in the room. That's where all the drugs are. Yes, there may have been other people involved in that room, but clearly, as I've already indicated, he is an aider and abettor, an accessory in possessing with intent to distribute drugs. I have absolutely no doubt about that.

In *Kohler v. State,* 203 Md.App. 110, 119, 36 A.3d 1013 (2012), this Court recently applied aiding and abetting principles to statutory drug offenses including possession with intent to distribute, and to a common law conspiracy to distribute conviction. We explained:

Maryland does not have an "aiding and abetting" statute. Nevertheless, under established case law, a person who did not actually commit the crime in question may nevertheless be guilty to the same degree as the person who did. Whereas principals in the first degree "commit the deed as perpetrating actors, either by their own hand or by the hand of an innocent agent," principals in the second degree are "present, actually or constructively, aiding and abetting the commission of the crime, but not themselves committing it[.]" "An aider is one who assists, supports or supplements the efforts of another in the commission of a crime."

*Id.* (some citations omitted).

Constructive presence may be "fairly broad" given that "one need not be in sight or hearing of the crime being committed to be a principal in the second degree." *State v. Sowell,* 353 Md. 713, 731–32, 728 A.2d 712 (1999). "The common element in constructive presence for the purpose of proving a defendant was a principal in the second degree ... is the ability, desire, and design to render any necessary aid to the principal in the first degree during the commission of the crime." *Id.*

"A person is constructively present when he is physically absent from the situs of the crime but aids and abets the principal in the first degree at the time of the offense from some distance. This may happen when one stands watch for the primary actor, signals to the principal from a distance that the victim is coming, or stands ready (though out of sight) to render aid to the principal if needed. However, one must be close enough to render aid if needed."

*Id.* at 732, 728 A.2d 712 (citation and footnote omitted).

In our view, the concept of "constructive possession of CDS" reflects the application of the aiding and abetting concept of "constructive presence" to CDS offenses. Thus, a person may be found to have constructive possession of CDS if he or she has knowledge of it, maintained dominion or control over the premises where the contraband is located, and demonstrated "the ability, desire, and design to render any necessary aid to [a] principal in the first degree during the commission of the crime." *See id.; Neal,* 191 Md.App. at 316, 991 A.2d 159.

The record supports a conclusion that the evidence was sufficient to establish beyond a reasonable doubt that appellant was in constructive possession of the CDS by facilitating the possession and distribution activities that occurred in Room 118. Appellant's knowledge of, and continuing control over, the CDS can be reasonably inferred from evidence that at the time of his arrest, he had rented Room 118 and was steps away from returning to that room where CDS, in plain view, was being packaged for distribution in the following circumstances.

- Appellant rented Room 118 on Sunday, August 30, 2009. Although he claimed that he rented it for only one night, hotel receipts and records indicate that the room was rented to him through Tuesday, September 1, 2009.

- Although appellant denied ever having been inside Room 118, when the deputies entered the room, his checkbook was lying in plain view on a bed.

- Unpackaged heroin and cocaine, bagged marijuana, a smoking device, a scale, and packaging materials were in plain view on top of a dresser. The amount, variety, and value of the CDS in the room, as well as the packaging paraphernalia, indicate that it was being prepared for distribution, not simply for personal use.

- Appellant admitted that he allowed Vaughan Watson, a person he knew from "the neighborhood," use of the room and provided him a room key. He did not tell his mother that he had rented the room, or why.

- After appellant learned of the events at the hotel, he drove immediately there.

- Appellant did not tell his mother that he was at the hotel. Nor did he enter the front door where he knew she was on duty and police were present. Instead, appellant entered a back door that required a key card for entry, in the company of Sidney Roy. Although appellant testified that the door was already open and that he just happened to walk in at the same time as Roy, both Rickard and Schwink observed them enter together after swiping a card.

- When they entered the hotel, they saw Rickard outside the room, they turned and ran.[7] Hotel security camera videotape reviewed by Schwink showed that either appellant or Roy dropped a key card near Room 118.

- Appellant gave conflicting versions of his reason for being at the hotel.

When viewed in the light most favorable to the prosecution, this evidence, and reasonable inferences therefrom, are sufficient to establish beyond a reasonable doubt that appellant rented the room where a large quantity and variety of CDS with a significant value was being packaged for distribution was seen in plain view; that the discovery of his checkbook in the room inferred his presence in the room and his intent to

---

7. Although arguably relevant, based on that conduct, the State did not pursue a "flight" argument.

return for it; that he was therefore aware of the CDS and distribution activities; that he provided access to the room to other persons, but maintained dominion and control by retaining a room key and/or access to the room through his friend Sidney Roy; and that, after learning that his mother locked out the room and called police, he went to the hotel to render aid to secure the contraband, including using his previously issued key to access the room or his status as the registered guest to obtain a new key.

Similarly, the evidence was sufficient to establish that appellant conspired with Roy to distribute the CDS found in Room 118. Proof of a criminal conspiracy requires a showing of "an unlawful agreement," which is "a combination of two or more persons to accomplish some unlawful purpose[.]" *Townes v. State*, 314 Md. 71, 75, 548 A.2d 832 (1988). "The agreement need not be formal or spoken, provided there is a meeting of the minds reflecting a unity of purpose or design." *Id.* The conspiracy "is complete when the unlawful agreement is reached," so that "no overt act in furtherance of the agreement need be shown." *Id.*

Appellant's complaint that "there was no direct proof of an agreement of any kind between [him] and Sidney Roy" ignores that "a conspiracy may be shown by circumstantial evidence, from which a common design may be inferred[.]" *Mitchell v. State*, 363 Md. 130, 145, 767 A.2d 844 (2001). The circumstantial evidence reviewed above supports an inference that appellant and Roy, in response to Ms. Bordley's lock-out of Room 118, made haste to the hotel and headed directly to Room 118 in an effort to secure the CDS and paraphernalia, some of which had been left sitting out in plain sight when the room was locked out. In particular, a reasonable fact finder could conclude that appellant and Roy returned to the hotel in order to gain access to the room. In turn, the trial court could reasonably find that appellant and Roy agreed to act in concert to distribute the CDS they were attempting to secure. That there were co-conspirators in addition to appellant and Roy, with different roles in the distribution scheme, is no

defense. *Cf., e.g., Manuel v. State,* 85 Md.App. 1, 16, 581 A.2d 1287 (1990) (To establish a CDS distribution conspiracy, it is not necessary to "show direct communication between all persons in the chain of ... supply and retailing of the narcotics. The parties' knowledge of the existence and importance of the other links in the distribution chain may be inferred from the circumstances, and it is sufficient to show the combination and community of interest."); *Bolden v. State,* 44 Md.App. 643, 652, 410 A.2d 1085 (1980) (" '[T]he law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connection with it, without requiring evidence of knowledge of all its details or of the participation of others.' ") (quoting *Blumenthal v. United States,* 332 U.S. 539, 557, 68 S.Ct. 248, 92 L.Ed. 154 (1947)).

**JUDGMENT OF THE CIRCUIT COURT FOR QUEEN ANNE'S COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**