74 A.3d 802

**Cory Jamaul JONES**

v.

**STATE of Maryland.**

**No. 2224, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

Sept. 4, 2013.

484

486

Martha Gillespie (Paul B. DeWolfe, Public Defender, on the brief) Baltimore, MD, for appellant.

Brian S. Kleinbord (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: WOODWARD, GRAEFF, FREDERICK J. SHARER (Retired, Specially Assigned), JJ.

SHARER, J.

Following a jury trial in the Circuit Court for Wicomico

County, appellant, Cory Jamaul Jones[1], was convicted of attempted first degree murder, first degree assault, use of a firearm in the commission of a felony, illegal possession of a regulated firearm, and related offenses.[2]

In his timely appeal, appellant presents the following questions, as slightly rephrased, for our consideration:

1. Did the motions court err in denying appellant's motion to suppress the results of a gunshot residue test?

2. Was the evidence sufficient to support the conviction for illegal possession of a regulated firearm where there was no testimony that the weapon came within the definition of a regulated firearm?

3. Did the trial court err in giving a flight instruction?

Discerning neither error nor abuse of discretion, we shall affirm the judgments of the circuit court.

## FACTUAL and PROCEDURAL HISTORY

On November 5, 2010, at about 7:00 p.m., Jomel Fields was sitting in her car, parked in the driveway of a residence at 923 East Church Street in Salisbury, Wicomico County. While Fields was talking on the phone and waiting for her friend, Tyrell Holly, whom she had just dropped off at the house, two African–American men approached her car. They pulled open the car door, pressed their guns against her head, told Fields to end her phone call, and demanded she hand over her money.

The men were attempting to remove her from the car when Holly exited the upstairs apartment, drawing their attention. At that time, Fields saw a police car on the adjoining block

---

**1.** Appellant's name is listed variously in the record as both Cory Jamaul Jones, or Corey Jamual Jones.

**2.** The circuit court sentenced appellant to life imprisonment on the charge of attempted first degree murder. The court further sentenced appellant to serve two consecutive terms of five years, to be served without the possibility of parole, for the use of a firearm during the commission of a felony and illegal possession of a regulated firearm. The other convictions were merged for the purposes of sentencing.

and hit her panic alarm. Startled by the alarm, the two assailants began shooting, first at the house, and then at the car. Fields sustained multiple gunshot wounds to her lower extremities and back as a result of the attack.[3]

Fields was found a few moments after the shooting by Corporal Brian Whitman of the Salisbury Police Department. Whitman called for medical assistance, and questioned Fields to obtain a description of her assailants. Fields was unable to provide a detailed description because her attackers had held their guns to her temple, preventing her from turning her head.

Officers Ryan Mitchell and Timothy Robinson and Corporal Howard Drewer, all of the Salisbury Police Department, were responding to an unrelated complaint in the area at the time the shooting occurred. Mitchell and Robinson saw two men firing guns into the house at 923 East Church Street, and immediately proceeded to drive around the block to the residence in their separate vehicles. Approximately 30 seconds after observing the shooting, as Mitchell turned the corner onto Church Street, he saw a man walking away from the residence where the shooting had occurred. When Mitchell attempted to stop him, the man grabbed a weapon from where it had been concealed in his waistband and pointed it at the officer. Mitchell exited his car, moving to the rear with his gun drawn. The assailant fled, and Mitchell pursued him on foot.

Robinson, who was in a car directly behind Mitchell, observed the assailant's actions. When the gunman fled, Robinson pursued him in his vehicle, observing as the gunman ran behind some buildings on Priscilla Street. A few moments later, Robinson observed Drewer pursuing and apprehending the assailant, and went to assist in the arrest.

---

**3.** Upon examination at Peninsula Regional Medical Center, Fields was found to have suffered eleven bullet wounds in her lower abdomen, lower back, pubic area, right thigh, and left leg. Bullet fragments were removed from her lower body that night and during three subsequent surgeries that occurred over the next several months.

Drewer was in the area of Priscilla Street when he heard the radio communications from Mitchell and Robinson regarding the fleeing assailant. Shortly thereafter, Drewer saw the gunman, who had been running across the road directly towards him with a gun in his hand, change direction to run into an adjacent field. Drewer pursued the gunman with his emergency equipment activated, repeatedly yelling over his vehicle's intercom for the man to stop. When the assailant continued to run, Drewer exited his vehicle and continued the pursuit on foot. The gunman lost his footing near the railroad tracks; when he got up, he turned to face Drewer with his hands raised over his head, the gun held in his right hand. At Drewer's order, the man tossed the gun about 15 feet to his right, where it was later recovered and preserved as evidence. The gunman was arrested and transported to the Salisbury Police Department.

At trial, Mitchell, Robinson, and Drewer each identified appellant as the man they had pursued and arrested on November 5, 2010. Additionally, they each identified State's Exhibit 1 as the gun that was discarded by appellant at the time he was apprehended. Jomel Fields also testified that the gun identified as State's Exhibit 1 "looked like" the gun that was used to shoot her. The gun was admitted into evidence at trial without objection. Upon forensic examination, the gun recovered by Drewer could not be excluded as the weapon that fired some of the bullets that were recovered from the crime scene at 923 East Church Street.

## I. MOTION TO SUPPRESS RESULTS OF GUN SHOT RESIDUE TEST

### A. *Issue Specific Facts*

After appellant was booked, Detective Thomas Hitty performed a gunshot residue test on appellant's hands. The swabs taken from appellant's hands were re-sealed into the gunshot residue kit and submitted to the Maryland Crime Lab for analysis. The gunshot residue kit was admitted into evidence at appellant's trial without objection. When tested,

particles consistent with gunshot residue were found to be present on the swab taken from appellant's left hand.[4]

Prior to trial, appellant moved to suppress the results of the gunshot residue ("GSR") test. At the motions hearing, Hitty testified as the State's only witness, preliminarily recounting the circumstances surrounding the charged offenses and appellant's arrest. Hitty explained that a GSR kit consists of multiple small swabs that are rubbed on a suspect's hands and the webbing of the fingers to collect any chemical residue given off by a discharged firearm. The swabs are then sealed back into the kit and submitted to the crime lab for analysis. Hitty further testified that the chemical residue on a suspect's hands degrades "in a short amount of time," and is easily destroyed or contaminated if the suspect perspires, washes or urinates on his hands, or rubs his hands on his clothing. Instructions in the GSR test kit and Maryland State Police guidelines recommend that a sample be collected within three hours after the suspected discharge of the firearm.

As to the timing of the GSR test, Hitty testified that within 45 minutes after appellant's arrest, he approached appellant in the booking area of the Salisbury Police Department. Hitty informed the court that after identifying himself to appellant, he rubbed appellant's hands with the swabs from the GSR kit. During the collection of the GSR sample, appellant indicated that "he wanted to make no statements without a lawyer present." Appellant also questioned whether Hitty had a warrant to conduct the GSR test. Otherwise, appellant did not verbally or physically resist Hitty's collection of the GSR samples. When Hitty finished swabbing appellant's hands, he left the holding cell without engaging in any additional conversation with appellant.

After hearing the testimony of Hitty and the arguments of counsel, the motions court concluded that the collection of gunshot residue from appellant's hands was a non-invasive search justified by exigent circumstances, opining in part:

---

**4.** There is no issue as the reliability of the gunshot residue test.

The most persuasive argument to me to deny the motion to suppress is the fact that the process is not invasive, unlike drawing blood from a suspected drunk driver or a body cavity search, or even reaching into someone's pants to withdraw something that's been secreted, such as CDS. Or even a buccal swab. This is less invasive than that. In fact, it's more like fingerprints. I don't believe a search warrant is required for the taking of fingerprints.

As to the exigency of the circumstances, the court credited Hitty's testimony regarding the several ways a defendant could contaminate or remove the residue from his or her hands while in custody. The court further noted that it would be unnecessarily burdensome for the police to have to closely monitor an arrestee to ensure that the evidence was not destroyed while they obtained a search warrant to collect the samples. On these bases, the court denied appellant's motion to suppress the GSR test results.

### B. *Arguments of the Parties*

Appellant contends that the GSR test constituted an unreasonable search and seizure; thus, he concludes, the motions court erred by denying his motion to suppress. Specifically, appellant asserts that in the absence of exigency—given that more than two hours remained before the GSR test results would have been compromised due to the passage of time—the failure of the police to obtain a warrant before collecting physical evidence from his body, without his consent, constituted an illegal search in violation of his Fourth Amendment rights. Appellant further asserts that the GSR test results should be characterized as an involuntary self-incriminating statement and, further, that he was denied the right to the presence of counsel while incriminating evidence was being collected from his body, in violation of his Fifth and Sixth Amendment rights.

The State responds that appellant failed to properly preserve his arguments regarding self-incrimination and deprivation of his right to counsel for appellate review, and that even if they were preserved, appellant's arguments on these points

are without merit. Addressing the merits of appellant's preserved arguments, the State maintains that the warrantless intrusion upon appellant's person for the purpose of collecting GSR evidence was a properly limited search incident to appellant's lawful arrest and was further justified by the exigency of the situation presented.

## C. *Preservation*

█ Initially, we consider whether appellant's arguments have been properly preserved for appellate review, as this Court "ordinarily will not consider any point or question 'unless it plainly appears by the record to have been raised in or decided by the trial court.'" *Robinson v. State,* 404 Md. 208, 216, 946 A.2d 456 (2008) (citations omitted); Md. Rule 8–131(a). The State, as previously noted, contends that appellant's arguments regarding his right to counsel have not been preserved.

█ To preserve an assignment of error based on an evidentiary question, a party is required to bring its position to the attention of the trial court so that the court may pass upon any objection, and possibly correct any errors. *Robinson,* 404 Md. at 216–17, 946 A.2d 456 (noting that such requirements serve the interest of fairness and judicial economy). The failure to raise a particular argument in support of a request to exclude evidence acts as a waiver of the argument for the purposes of appellate review. *See Stone v. State,* 178 Md.App. 428, 445, 941 A.2d 1238 (2008) (holding that the failure to argue a particular theory at a suppression hearing waives the ability to argue that theory on appeal).

At the suppression hearing, appellant's counsel did not invoke the protections of either the Fifth or Sixth Amendments as grounds for his motion to suppress. Indeed, when asked by the motions court for the basis of the motion, defense counsel responded that "the only issue that [h]e would present to the Court" was "a search of Mr. Jones for a GSR analysis." Allegations of an illegal search implicate a defendant's Fourth Amendment rights, not the right against self-incrimination

under the Fifth Amendment or the right to counsel under the Sixth Amendment. Based on counsel's limited response below, the issue of Fifth or Sixth Amendment violations were not before the motions court. Therefore, we conclude that appellant waived his right to now argue that the collection of the GSR evidence infringed upon his Fifth or Sixth Amendment rights.

Even had appellant's arguments been properly preserved, we would conclude that he was not entitled to relief on these grounds. The protections of the Fifth Amendment prohibiting the admission of compelled statements or physical communications that are self-incriminatory do not apply to physical characteristics such as the giving of a blood sample, voice sample, or handwriting exemplar. *Pennsylvania v. Muniz*, 496 U.S. 582, 595–98, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990); *United States v. Dionisio*, 410 U.S. 1, 7, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); *Gilbert v. California*, 388 U.S. 263, 266–67, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). We agree with other jurisdictions that have considered this issue, concluding that "[a GSR] test is a nontestimonial identification procedure 'comparable to handwriting exemplars, voice samples, photographs, and lineups.'" *State v. Page*, 169 N.C.App. 127, 609 S.E.2d 432, 436 (2005) (quoting *State v. Coplen*, 138 N.C.App. 48, 530 S.E.2d 313, 318 (2000)); *U.S. v. Pettiford*, 295 F.Supp.2d 552, 560 n. 10 (D.Md.2003) ("A GSR test does not invoke the protections of the Fifth Amendment because it does not provide evidence of a testimonial or communicative nature."). Indeed, appellant concedes that GSR evidence has been classified as nontestimonial evidence. Therefore, we are not persuaded by appellant's argument that he was forced to make a self-incriminatory statement within the meaning of the Fifth Amendment.

We also find to be unavailing appellant's arguments regarding his Sixth Amendment right to the presence of counsel while the GSR sample was collected. Absent a waiver, the Sixth Amendment prohibits the admission of a statement by a criminal defendant if the statement is made (1)

outside the presence of legal counsel; (2) in response to interrogation; and (3) after the right to counsel has attached with respect to the charge being tried. *Conyers v. State,* 354 Md. 132, 192, 729 A.2d 910 (1999). Once the right to counsel attaches, a criminal defendant is entitled to the presence of counsel at every "critical stage" of his trial. *See Adams v. State,* 192 Md.App. 469, 480–84, 995 A.2d 763 (2010) (discussing right to counsel). The GSR test in the instant case was performed after appellant's arrest, but before any charges or adversarial proceedings commenced. Further, we are not persuaded that the administration of a GSR test, a non-adversarial encounter for the purpose of collecting evidence, is a "critical stage" at which appellant was entitled to the presence of counsel. Therefore, appellant's Sixth Amendment right to counsel had not yet attached and, thus, was not infringed by the collection of GSR evidence.

■ Moreover, appellant does not contend, and the record does not indicate that the GSR test was conducted in conjunction with any interrogation by the police. Therefore, his rights under the protections afforded by the Fifth Amendment or *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), are likewise inapplicable. Other courts addressing this issue have come to similar conclusions. *See, e.g., State v. Odom,* 303 N.C. 163, 277 S.E.2d 352, 355 (1981) (concluding that arrestee was not entitled to counsel during GSR test, relying on Supreme Court cases indicating that the collection of physical evidence, such as fingerprints, blood, clothing, and hair, does not constitute a critical stage of trial); *United States v. Love,* 482 F.2d 213, 217 (5th Cir.1973) (holding that collection of physical evidence was not a critical stage during which arrestee was entitled to counsel because such tests "involve[ ] none of the probing into an individuals' private life and thoughts that marks an interrogation or search."). For the foregoing reasons, even had appellant properly preserved his constitutional arguments, we would find that his rights were not violated by the circuit court's admission of the GSR test results.

## D. *Standard of Review*

We now consider appellant's argument that the warrantless seizure of the GSR evidence constituted an illegal search, requiring that the evidence must be excluded.

"In reviewing the ruling on a motion to suppress evidence, we consider only the evidence contained in the record of the suppression hearing." *Bost v. State*, 406 Md. 341, 349, 958 A.2d 356 (2008); *Rush v. State*, 403 Md. 68, 82–83, 939 A.2d 689 (2008); *Gatewood v. State*, 158 Md.App. 458, 475–76, 857 A.2d 590 (2004); *Mendes v. State*, 146 Md.App. 23, 40, 806 A.2d 370 (2002). We do not consider the evidence that was admitted at trial. *Charity v. State*, 132 Md.App. 598, 605, 753 A.2d 556 (2000). We "do not engage in *de novo* fact-finding." *Haley v. State*, 398 Md. 106, 131, 919 A.2d 1200 (2007). "Instead, we 'extend great deference to the findings of the motions court as to first-level findings of fact and as to the credibility of witnesses, unless those findings are clearly erroneous.' " *Padilla v. State*, 180 Md.App. 210, 218, 949 A.2d 68, *cert. denied*, 405 Md. 507, 954 A.2d 468 (2008) (quoting *Brown v. State*, 397 Md. 89, 98, 916 A.2d 245 (2007)); *Gatewood*, 158 Md.App. at 475–76, 857 A.2d 590; *Sifrit v. State*, 383 Md. 77, 92–93, 857 A.2d 65 (2004); *State v. Rucker*, 374 Md. 199, 207, 821 A.2d 439 (2003).

In making our ruling, we "review the evidence and the inferences that may be reasonably drawn in the light most favorable to the prevailing party," in this case, the State. *Bost*, 406 Md. at 349, 958 A.2d 356; *Gatewood*, 158 Md.App. at 475–76, 857 A.2d 590. But, "[w]e make our own independent appraisal as to whether a constitutional right has been violated by reviewing the law and applying it to the facts of the case." *Bost*, 406 Md. at 349, 958 A.2d 356; *Gatewood*, 158 Md.App. at 475–76, 857 A.2d 590. *See also Williams v. State*, 372 Md. 386, 401, 813 A.2d 231 (2002) (stating that reviewing court makes "an independent, *de novo*, constitutional appraisal by applying the law to the facts presented in a particular case"); *Nathan v. State*, 370 Md. 648, 659, 805 A.2d 1086 (2002) (recognizing that, in review of a ruling upon a motion to

suppress, appellate courts consider facts in the light most favorable to the prevailing party).

### E. *Analysis*

Generally, a search conducted without a warrant supported by probable cause violates the Fourth Amendment's prohibition against unreasonable search and seizure. *Belote v. State,* 411 Md. 104, 112, 981 A.2d 1247 (2009); *Cherry v. State,* 86 Md.App. 234, 240, 586 A.2d 70 (1991). Exceptions exist, however, for evidence that is collected in the course of a warrantless search that is conducted "incident to a lawful custodial arrest,"[5] and for evidence that is seized without a warrant due to "exigent circumstances."[6] *Belote,* 411 Md. at 112, 981 A.2d 1247 (citations omitted); *U.S. v. Pettiford,* 295 F.Supp.2d 552, 560 (D.Md.2003).

The parties have directed us to no Maryland appellate opinion, nor have we found any, addressing an assertion that the collection of GSR evidence constituted an illegal search under the Fourth Amendment, rendering the evidence inadmissible at trial. We find guidance in opinions of the Federal courts, which have consistently held that, so long as the search is supported by adequate probable cause, GSR evidence is admissible even without a valid search warrant.

For example, in *U.S. v. Pettiford,* 295 F.Supp.2d 552 (D.Md. 2003), the defendant was apprehended after the police responded to the scene of a "road rage" shooting. *Id.* at 555–57. The police observed Pettiford only minutes after the shooting, in a location only a few blocks from where the incident had

---

**5.** A warrantless search incident to an arrest that is supported by probable cause is justified by the need of the police to "(1) to seize weapons from the arrestee that might be used to effect an escape or to harm law enforcement officers; and (2) to recover evidence that might be destroyed by the arrestee." *Belote,* 411 Md. at 113, 981 A.2d 1247 (citations omitted).

**6.** The exigent circumstances exception requires that " 'police officers (1) have probable cause to believe that evidence of illegal activity is present and (2) reasonably believe that evidence may be destroyed or removed before they could obtain a warrant[.]' " *United States v. Cephas,* 254 F.3d 488, 494–95 (4th Cir.2001).

occurred, traveling in the direction the shooter reportedly was driving when he left the scene of the crime. *Id.* at 558. Pettiford matched the physical description of the shooter and was driving a car that matched descriptions of the shooter's car. *Id.* Also, the front passenger window of Pettiford's car was broken, with glass still falling to the ground, indicating that the damage had occurred recently. *Id.* Pettiford initially attempted to evade the police, but was quickly apprehended. *Id.* While questioning Pettiford, the police observed bullet holes in the driver's side door of his car. *Id.* at 559. Pettiford admitted that he was involved in the "roadrage" incident, but claimed that he was only a victim, not a shooter. *Id.* at 555, 559.

After the police seized his car and towed it away as evidence of the shooting, Pettiford voluntarily accompanied an officer to the police station where he submitted to a GSR test without objection. *Id.* at 556. Pettiford was then held at the police station for more than five hours before he was placed under arrest for his participation in the shooting. *Id.* at 555–57. Prior to trial, Pettiford moved to suppress the GSR evidence, arguing that it was collected without a warrant in violation of his Fourth Amendment rights. *Id.* at 560.

In its ruling on Pettiford's motion to suppress, the United States District Court for the District of Maryland first determined that the initial investigative stop of Pettiford was adequately supported by reasonable articulable suspicion, and that Pettiford's subsequent detention and arrest were based upon probable cause; therefore, Pettiford's arrest was legal. *Id.* at 558, 559. Considering Pettiford's argument that suppression of the GSR evidence was necessary, the Court concluded that Pettiford had consented to the collection of the GSR evidence. *Id.* at 560. The Court further opined, however, that even had Pettiford not consented, the evidence collected during the warrantless search would be admissible pursuant to the exigent circumstances exception to the warrant requirement. *Id.*

In support of its holding, the Court recounted the information that was known to the police at the time the GSR

evidence was collected and concluded that the detective who conducted the search, "had probable cause to believe that the GSR test would yield evidence that Pettiford had discharged a firearm." *Id.* The Court next noted testimony indicating that GSR evidence remains detectable on a person's hands for only a limited period of time after a shooting, and that it is easily destroyed. *Id.* at 560–61. The Court opined that delay to obtain a search warrant to conduct the GSR test increases a detainee's "opportunity to destroy the evidence by simply washing his hands." *Id.* The Court also observed that the GSR test required only the swabbing of Pettiford's hands, which constituted "only a minimal intrusion" upon his privacy. *Id.* at 561. Based upon its determinations, the *Pettiford* Court ultimately concluded that exigent circumstances justified the warrantless collection of the GSR evidence and, therefore, the evidence was admissible at Pettiford's trial.[7] *Id.* at 561. *See also U.S. v. Bridges,* 499 F.2d 179, 183–84 (7th Cir.1974) (finding no error in trial court's denial of defendant's motion to suppress evidence that he had recently handled dynamite, based upon scientific testing of swabs taken from his hands without a warrant, opining that some tests "are such minor intrusions into or upon the 'integrity of an individual's person' that they are not, in the absence of a search warrant, unreasonable intrusions," and analogizing the swabbing of a suspect's hands to the collection of fingerprints or taking of photographs, neither of which require a warrant).

Subsequent to *Pettiford,* the United States Court of Appeals for the Fifth Circuit decided *United States v. Johnson,* 445 F.3d 793 (5th Cir.2006), *cert. denied,* 547 U.S. 1199, 126 S.Ct.

---

**7.** The decision in *Pettiford,* permitting the admission of GSR evidence collected without a warrant pursuant to a detention or arrest supported by probable cause, is consistent with determinations rendered by other Federal Courts. *See e.g., United States v. Analla,* 975 F.2d 119, 125 (4th Cir.1992) (finding no basis for reversal in trial court's admission of GSR evidence collected after petitioner's lawful arrest); *United States v. Pearsall,* 492 F.Supp.2d 432, 438–39 (D.Del.2007) (holding that where arrest was legal, GSR evidence collected during search incident to arrest was admissible).

2884, 165 L.Ed.2d 908 (2006), wherein it considered the trial court's admission of GSR evidence collected after the defendant was lawfully arrested. *Id.* at 796. The *Johnson* Court noted that "[i]ncident to a lawful arrest, 'it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction." *Id.* at 795 (quoting *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969)). Acknowledging that the presence of gun powder on Johnson's hands was relevant evidence of the charged offense that could easily be removed or destroyed, the Court opined that, so long as Johnson's arrest was valid, the GSR test was lawful and the admission of the results of the GSR test at his trial was not erroneous. *Id.* at 795–96.

Analogizing GSR evidence to other substances that may be collected from a suspect's body by minimally invasive means, we find the decision of the Federal District Court of Maryland in *Pettiford,* and of the Fifth Circuit Court in *Johnson,* to be consistent with the earlier decision of the United States Supreme Court in *Cupp v. Murphy,* 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973). Cupp's estranged wife had been strangled in her home. *Id.* at 292, 93 S.Ct. 2000. The police had probable cause to believe that Cupp was the person who had killed her. *Id.* at 293–94, 93 S.Ct. 2000. Cupp submitted voluntarily to an interview at the police station, at which time the officers observed a dark spot on Cupp's finger that appeared to be blood. *Id.* at 292, 93 S.Ct. 2000. Cupp refused when the police requested to take scrapings from under his fingernails. *Id.* Cupp was forcibly detained for a short time while the police collected the physical evidence from his hands. *Id.* The samples from Cupp's hands were later analyzed and found to contain traces of his wife's skin and blood cells and fabric from her nightgown. *Id.* The evidence was admitted at Cupp's trial. *Id.*

On appeal, Cupp asserted the physical evidence was obtained without a warrant in violation of the protections afforded to him by the Fourth and Fourteenth Amendments, prohibiting unreasonable searches. *Id.* The Court noted that

incident to an arrest supported by probable cause, police are permitted to conduct a warrantless search of the items or area within the immediate control of a detained suspect for the purpose of seizing any weapons or incriminating evidence that might otherwise be used or destroyed. *Id.* at 295, 93 S.Ct. 2000 (citing *Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969)). The Court opined that in light of the circumstances presented, "the very limited search" was "necessary to preserve the highly evanescent evidence" on Cupp's hands. *Id.* at 296, 93 S.Ct. 2000. On this basis, the Court concluded that the warrantless search did not violate the defendant's Fourth and Fourteenth Amendment rights, and therefore, the results of scientific tests performed on the evidence collected from Cupp's hands was properly admitted at his trial. *Id.*

Opinions of the appellate courts of our sister States are largely consistent with the Federal precedents discussed above, holding that the warrantless collection of GSR evidence from an individual whom the police have probable cause to believe has recently fired a gun in the course of committing a crime, does not violate the Fourth Amendment's prohibition against unreasonable searches and seizures.[8] The limited intrusion on the individual required to collect GSR evidence is

---

**8.** *See, e.g., Arizona v. Beasley,* 205 Ariz. 334, 70 P.3d 463, 465–66 (Ct.App.2003) ("no warrant was required for a reasonable search incident to a valid arrest" (citations omitted)); *Ray v. Arkansas,* 304 Ark. 489, 803 S.W.2d 894, 899 (1991) ("test was reasonable in light of the exigent circumstance"); *Connecticut v. Chesney,* 166 Conn. 630, 353 A.2d 783, 788 (1974) (opining that application of paraffin casts to defendants hands in order to detect GSR was permitted where arrest was supported by probable cause). *Durden v. Georgia,* 293 Ga. 89, 744 S.E.2d 9, 17 (2013) (denying ineffective assistance of counsel claim based on failure to file a motion to suppress results of GSR test because, " '[s]wabbing the hands of an accused to lift gunshot residue does not constitute an unconstitutional search or seizure[,]' " therefore a motion to suppress "would have been meritless" (citations omitted)); *Strickland v. Georgia,* 247 Ga. 219, 275 S.E.2d 29, 36 (1981) ("Swabbing the hands of an accused to lift gunshot residue does not constitute an unconstitutional search or seizure ..."); *Illinois v. Allen,* 376 Ill.App.3d 511, 314 Ill.Dec. 934, 875 N.E.2d 1221, 1228 (2007) ("Because the hand swabbing was so 'minor an imposition that the defen-

often analyzed as a search incident to a legal arrest, or justified by exigent circumstances due to how easily GSR evidence can be destroyed through either intentional or unintentional actions. Both analyses are applicable to the facts presented in the instant appeal.

Appellant does not assert that his arrest was not supported by adequate probable cause, nor that the collection of the GSR

---

dant suffered no true humiliation or affront to his dignity,' we find a search warrant was not required to justify the GSR test after defendant was in custody ..." (citation omitted)); *Hubbert v. Mississippi,* 759 So.2d 504, 508 (Miss.Ct.App.2000) ("Because the chemicals sought to be found on Hubbert's hand could have been easily and quickly destroyed, the officers would have been within their rights to swab Hubbert's hand even over his objections." (citation omitted)); *Walker v. Mississippi,* 759 So.2d 422, 426 (Miss.Ct.App.1999) ("Having determined that there was probable cause to arrest Walker, we affirm the lower court's decision to admit the gunshot residue test results ..."); *Missouri v. Howell,* 524 S.W.2d 11, 16–18 (Mo.1975) (reversing judgments because GSR evidence was not admissible without proof that the police had probable cause to arrest and search defendant); *Missouri v. Morris,* 662 S.W.2d 884, 893 (Mo.Ct.App.1983) ("Defendant's arrest being lawful ... the administration of the gunshot residue test" was also lawful); *Montana v. Ulrich,* 187 Mont. 347, 609 P.2d 1218, 1221 (1980) (reversing trial court's determination suppressing GSR evidence based on failure of police to obtain defendant's express consent, finding that limited intrusion of search was within the scope of a reasonable search incident to a lawful arrest); *North Carolina v. Page,* 169 N.C.App. 127, 609 S.E.2d 432, 436–37 (2005) (admitting results of GSR test to which defendant consented, alternately finding no error in trial court's determination that probable cause and exigent circumstances justified immediate search); *North Carolina v. Trull,* 153 N.C.App. 630, 571 S.E.2d 592, 598–99 (2002) (concluding that collection of GSR evidence was reasonable and not a violation of defendant's rights); *North Carolina v. Coplen,* 138 N.C.App. 48, 530 S.E.2d 313, 320 (2000) (holding that because "probable cause and exigent circumstances existed at the time of the gunshot residue test, ... the warrantless search was valid"); *Tennessee v. Lawrence,* 154 S.W.3d 71, 76, 78 (Tenn.2005) (holding that GSR evidence obtained during search incident to legal arrest was properly admitted into evidence); *West Virginia v. Riley,* 201 W.Va. 708, 500 S.E.2d 524, 533 (1997) (stating that admission of GSR evidence "is consistent with the general recognition that superficial examination of a lawfully arrested individual for evidence of gunpowder residue is not violative of the Fourth Amendment prohibition against unreasonable searches and seizures"); *Sen v. Wyoming,* 301 P.3d 106, 118, (Wyo.2013) ("[I]n light of the minimal intrusion caused by the swab for gunshot residue and the easy destructibility of such

evidence was not contemporaneous with his arrest. Therefore, we conclude that the GSR evidence was properly collected in the course of a reasonable search incident to appellant's lawful arrest, for which no warrant was required. *See Johnson,* 445 F.3d at 795 ("Incident to a lawful arrest, 'it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.").

Alternately, we note that Hitty's testimony established that there were temporal and practical barriers that greatly decreased the feasibility of waiting to obtain a search warrant prior to collecting the GSR evidence from appellant's hands. Hitty's testimony emphasized that the GSR evidence is viable for only a few hours, and could have been easily destroyed either intentionally or unintentionally by appellant during the time taken to secure a search warrant. Hitty further indicated that the procedure used to collect the GSR evidence is noninvasive, requiring nothing more than the rubbing of a swab across appellant's hands. Considering all the circumstances, we agree with the suppression court's determination that exigent circumstances justified the limited invasion of appellant's privacy to collect the GSR evidence from his hands without delaying to obtain a warrant. *See Pettiford,* 295 F.Supp.2d at 560–61 (where probable cause supported arrest and the evidence sought was highly evanescent, the limited intrusion of a search to collect GSR evidence was reasonable). We find no error in the motions court's analysis and ruling.

## II. SUFFICIENCY—ILLEGAL POSSESSION OF REGULATED FIREARM

### A. *Issue Specific Facts*

At trial, the parties stipulated that appellant was prohibited from possessing a regulated firearm under Md.Code (2003), Public Safety ("P.S.") § 5–133(b). To meet its burden of

---

evidence, administration of the gunshot residue test was a valid search incident to arrest.").

proving that the weapon used by appellant was a regulated firearm, the State presented the testimony of four witnesses to identify and describe the gun appellant was carrying on the night he was arrested. Fields, the victim, described the firearm as "like a gun that you would see off of GI Joe, like a machine type thing." When shown State's Exhibit 1, Fields stated "that looks like the gun that shot me." Mitchell testified that he thought that appellant's gun was "a Mack 10 or Tech 9," and that "[appellant] had a handgun, a Mack 10 as [he] called it." Mitchell also identified State's Exhibit 1 as the weapon that appellant brandished during their confrontation. Robinson identified State's Exhibit 1 as "the weapon that was found in the area of where [appellant] was." Drewer testified that he observed appellant running with "what [ ] looked like, an assault pistol in his hand." Corporal Drewer also identified State's Exhibit 1 as the weapon he saw in appellant's possession, which he recovered and processed as evidence after appellant was apprehended.

Without objection, the gun that was recovered by the police following appellant's arrest was admitted into evidence as State's Exhibit 1. The trial court, in its instruction to the jury, defined the term "regulated firearm" that was relevant to the charged offense. During his closing argument, defense counsel conceded that appellant possessed the gun, a regulated firearm, on the night of the alleged crimes, stating, "I can make deliberations very easy for you on ... count 8 ... possession of a regulated firearm, that's what he did." The jury was permitted to examine the gun after it was admitted into evidence and during their deliberations. Ultimately, the jury found appellant guilty of all of the charged offenses, including those alleging his use and possession of a regulated firearm.

### B. Arguments of the Parties

Appellant asserts that there was no evidence presented at his trial expressly indicating that the gun identified as State's Exhibit 1 fell within the definition of a regulated firearm under P.S. § 5–101(p). He contends that because the prose-

cutor failed to elicit an exact classification of the weapon, the State failed to sustain its burden of proof on this count and, therefore, reversal is required. The State disagrees, asserting that sufficient evidence was presented to allow a reasonable juror to conclude, beyond a reasonable doubt, that the weapon possessed by appellant was a regulated firearm.

## C. *Standard of Review*

The often repeated test for sufficiency of the evidence is, " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Bordley v. State*, 205 Md.App. 692, 716, 46 A.3d 1204 (2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)); *accord Smith v. State*, 415 Md. 174, 184, 999 A.2d 986 (2010); *see also Breakfield v. State*, 195 Md.App. 377, 392–393, 6 A.3d 381 (2010) (opining that the limited question before this Court is not "whether the evidence should have or probably would have persuaded the majority of fact finders but only whether it possibly could have persuaded any rational fact finder." (citation omitted)). This Court defers to the "unique opportunity" of the fact-finder to "view the evidence and to observe first-hand the demeanor and to assess the credibility of witnesses[.]" *Bordley*, 205 Md.App. at 717, 46 A.3d 1204 (citing *Smith*, 415 Md. at 185, 999 A.2d 986). We further decline to second-guess any reasonable inferences drawn by the fact-finder or to reweigh the fact-finder's resolution of conflicting evidence. *Id.* "If the evidence 'either showed directly, or circumstantially, or supported a rational inference of facts which could fairly convince a trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt,' then we will affirm the conviction." *Bible v. State*, 411 Md. 138, 156, 982 A.2d 348 (2009) (quoting *State v. Stanley*, 351 Md. 733, 750, 720 A.2d 323 (1998)).

We independently assess the evidence presented to determine, *de novo*, whether it was legally sufficient to sustain appellant's convictions. *See, e.g., Walker v. State*, 206 Md. App. 13, 41, 47 A.3d 590 (2012) (quoting *Polk v. State*, 183

Md.App. 299, 306, 961 A.2d 603 (2008) for the proposition, "An assessment of the legal sufficiency of the evidence is not an evidentiary issue but a substantive issue, with respect to which an appellate court makes its own independent judgment, as a matter of law.").

### D. *Analysis*

■■■ Appellant challenges only his conviction for illegal possession of a regulated firearm, which is prohibited by P.S. § 5–133(b), providing in pertinent part that a person who has previously been convicted of a "disqualifying crime" or certain common law violations, "may not possess a regulated firearm[.]"[9] *Id.* A "regulated firearm" is defined as a handgun, which is "a firearm with a barrel less than 16 inches in length," or any one of an enumerated list of assault rifles. P.S. § 5–101(n)(1); P.S. § 5–101(p).

The evidence presented at appellant's trial, which we view in the light most favorable to the State, established that appellant was prohibited from possessing a regulated firearm. The testimony of the victim and the arresting officers indicated that on the night of the shooting, appellant was observed to be in possession of the gun that was admitted into evidence as State's Exhibit 1. Appellant was also found to have gunshot residue on his hands following his arrest. The gun, which was entered into evidence was variously described as, "like a gun that you would see off of GI Joe, like a machine type thing," "a Mack 10 or Tech 9," "a handgun," and "an assault pistol." The trial court instructed the jury, pursuant to P.S. § 5–101(p)(1), that "any firearm with a barrel less than 16 inches in length" is a handgun, and that "any handgun is a regulated

---

9. P.S. § 5–133(c), defining the penalties for a violation of § 5–133(b), specifies that "[a] person may not possess a regulated firearm if the person was previously convicted of … a crime of violence; … a violation of [enumerated sections] of the Criminal Law Article;" or an offense in another State that would constitute one of the specified disqualifying offenses if it had been committed in Maryland. *Id.* A violation of P.S. § 5–133(b) is a felony, with a minimum mandatory sentence of five years, to be served without the possibility of parole. P.S. § 5–133(c)(2).

firearm." The jury was also given an opportunity to examine the gun, and thus were able to determine for themselves that it met the definition of a regulated handgun.

Accordingly, we conclude that the evidence was sufficient for the jury to find that the recovered gun met the statutory definition of a regulated firearm. *See Nash v. State,* 191 Md.App. 386, 406, 991 A.2d 831 (2010) (concluding that police officer's undisputed testimony that recovered gun was a "handgun" was sufficient to support conviction for illegal possession of a regulated firearm).

## III. FLIGHT INSTRUCTION

### A. *Issue Specific Facts*

The evidence revealed that police officers first observed appellant walking down the street, away from the scene of the shooting, with his head down. When Mitchell attempted to stop appellant, appellant stopped, then removed the gun he had concealed in his waistband, and pointed it at Mitchell. As Mitchell exited his car, moving to the back of the vehicle to obtain cover, appellant began to run away. He was pursued by Mitchell, and two other officers, and was eventually apprehended and placed under arrest.

The trial court provided the following instruction to the jury over the objection of defense counsel:

A person's flight or conduct analogous to flight immediately after the commission of a crime or after being accused of committing a crime is not enough by itself to establish guilt, but it is a fact that may be considered by you as evidence of guilt.

Flight under these circumstances may be motivated by a variety of factors, some of which are fully consistent with innocence. You must first decide whether there is evidence of flight. If you decide there is evidence of flight or conduct analogous to flight, you then must decide whether this flight shows a consciousness of guilt.[10]

---

10. The flight instruction provided by the trial court is substantially the same as the approved pattern jury instruction on flight. MPJI–CR 3:24.

The jury ultimately found appellant to be guilty of all of the offenses with which he was charged.

### B. *Arguments of the Parties*

Appellant asserts that the evidence failed to generate a flight instruction. The State, of course, contends otherwise.

### C. *Standard of Review*

Maryland Rule 4–325(c), governing jury instructions, provides in pertinent part, "[t]he court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding. . . . The court need not grant a requested instruction if the matter is fairly covered by instructions actually given." *Id.* The Court of Appeals has interpreted Rule 4–325(c) to require a trial court to provide an instruction requested by a party if:

(1) the requested instruction is a correct statement of the law; (2) the requested instruction is applicable under the facts of the case; and (3) the content of the requested instruction was not fairly covered elsewhere in the jury instruction actually given.

*Thompson v. State,* 393 Md. 291, 302, 901 A.2d 208 (2006)(quoting *Ware v. State,* 348 Md. 19, 58, 702 A.2d 699 (1997)). We review the trial court's decision to provide a requested jury instruction under an abuse of discretion standard. *Thompson,* 393 Md. at 302, 901 A.2d 208.

### D. *Analysis*

 Maryland courts have consistently allowed the admission of consciousness of guilt evidence, including flight from the scene of a crime, or flight from apprehension as "a factor that may be considered in determining guilt." *Davis v. State,* 237 Md. 97, 105, 205 A.2d 254 (1964).

"The flight doctrine has been applied to a broad spectrum of behavior occurring after the commission of a crime: 'flight from the scene or from one's usual haunts after the crime, assuming a false name, shaving off a beard, resisting arrest, attempting to bribe arresting officers, forfeiture of

bond by failure to appear, escapes or attempted escapes from confinement, and attempts of the accused to take his own life.' "

*Sorrell v. State,* 315 Md. 224, 228, 554 A.2d 352 (1989) (quoting McCormick on Evidence § 271 at 803 (3rd ed.1984)). To be characterized as consciousness of guilt evidence, it is not necessary that the evidence conclusively establish a defendant's guilt. *Thomas v. State,* 168 Md.App. 682, 712, 899 A.2d 170 (2006), *aff'd,* 397 Md. 557, 919 A.2d 49 (2007) (citing *Thomas v. State,* 372 Md. 342, 351, 812 A.2d 1050 (2002)). "The proper inquiry is whether the evidence could support an inference that the defendant's conduct demonstrates a consciousness of guilt." *Id.* (citing *Thomas,* 372 Md. at 356, 812 A.2d 1050) (emphasis in original). Alternate explanations for a defendant's flight that may weaken the inference that the defendant's actions were attributable to guilt should be considered by the jury to inform their weighing of the evidence. *State v. Edison,* 318 Md. 541, 549, 569 A.2d 657 (1990).

On this issue, appellant relies principally on *Thompson v. State,* 393 Md. 291, 901 A.2d 208 (2006). Thompson was arrested and charged with attempted first degree murder, first degree assault, possession of cocaine, and related charges. *Id.* at 294–95, 901 A.2d 208. When approached by an officer following the crime, Thompson fled on his bicycle. *Id.* at 294, 901 A.2d 208. He was eventually apprehended and placed under arrest. *Id.* At the time of his arrest, Thompson was found to have 86 vials of cocaine on his person. *Id.* Prior to trial, the circuit court dismissed the drug charges against Thompson, and excluded all evidence of the drugs from trial. *Id.* at 295, 901 A.2d 208. At the conclusion of Thompson's trial, the court, over objection, provided a flight instruction substantially similar to the one given in the instant case. *Id.* at 300, 901 A.2d 208. The jury found Thompson guilty of assault and other associated crimes. *Id.* On appeal, Thompson asserted that the trial court abused its discretion by providing the flight instruction. *Id.* at 301, 901 A.2d 208. Thompson maintained that he ran from the police, not because he was

guilty of the assault, but because he was in possession of a large amount of cocaine. *Id.* at 313, 901 A.2d 208.

In its analysis, the *Thompson* Court restated the test to determine whether consciousness of guilt evidence is sufficiently probative of guilt to support a flight instruction. The Court opined:

[T]he probative value of flight evidence as circumstantial evidence of guilt depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.... [A] flight instruction is improper unless the evidence is sufficient to furnish reasonable support for all four of the necessary inferences.

*Id.* at 312, 901 A.2d 208 (quoting *United States v. Myers*, 550 F.2d 1036, 1049, 1050 (5th Cir.1977)) (internal citations and quotation marks omitted).

The *Thompson* Court focused much of its analysis on the third element of the above stated test. Quoting *Thomas v. State*, 372 Md. 342, 812 A.2d 1050 (2002), the Court noted:

Knowledge that the person is suspected of the charged crime is important because the value of the conduct lies in the culprit's knowledge that he or she has committed the charged offense and in his or her fear of apprehension.

*Thompson*, 393 Md. at 313, 901 A.2d 208 (quoting *Thomas*, 372 Md. at 354, 812 A.2d 1050). The Court further quoted Thomas for the proposition that

[E]vidence of flight because of one crime cannot be considered on the trial of another and entirely different offense is apparent, as in such case the flight does not disclose any guilty conscience in regard to the offense in question.

Thus many courts emphasize the importance of connecting a defendant's consciousness of guilt to a consciousness of guilt for the specific crime alleged. There must be an evidentiary basis, either direct or circumstantial, to connect

a defendant's consciousness of guilt to the particular crime charged.

*Id.* (quoting *Thomas*, 372 Md. at 354–55, 812 A.2d 1050) (citations and footnote from *Thomas* omitted in original).

Ultimately, the *Thompson* Court concluded that, although the pattern flight instruction constituted a correct statement of Maryland law, *Id.* at 303, 901 A.2d 208, and the substance of the instruction was not covered in the other instructions that were given by the court, *Id.* at 308, 901 A.2d 208, the trial court abused its discretion by providing the flight instruction under the circumstances presented. *Id.* at 311, 901 A.2d 208. The Court explained:

> The gravamen of the issue is whether Mr. Thompson fled in an attempt to avoid apprehension for the crimes for which he was on trial. In the present case, the jury was not presented with evidence of what may have been an alternative and at least a cogent motive for Mr. Thompson's flight, specifically that drugs were found on his person. During his interview with police, Mr. Thompson asserted that he ran from them because he had drugs in his possession, which, according to the State, amounted to eighty-six vials of crack cocaine at the time of his arrest. He was in essence arrested *in flagrante delicto* with respect to the crime of possession of controlled dangerous substances. We find that this fact, which was known to all parties involved although not revealed to the jury, undermines the confidence by which the inference could be drawn that Mr. Thompson's flight was motivated by a consciousness of guilt with respect to the crimes for which he was on trial in the present case; it provides a foundation for the alternate, and equally reasonable, inference that Mr. Thompson fled due to the cocaine in his possession, an action a person in his position may have taken irrespective of whether he also shot and attempted to rob Mr. Gottesman. Mr. Thompson thus was placed in a difficult situation where he must either not object to the highly prejudicial evidence concerning his possession of a significant amount of cocaine being introduced to the jury to explain his flight (or perhaps forced to

make a Hobson's choice to introduce such evidence himself), or decline to explain his flight and risk that the jury would not infer an alternative explanation for his flight.

*Id.* at 313–14, 901 A.2d 208 (footnotes omitted).

As did Thompson, appellant maintains that the fact that he was walking down the street away from a house where a shooting had occurred only moments before, does not support a permissible inference that he was fleeing from the scene of the crime. Instead, appellant asserts, one could reasonably infer that he fled from the police because he did not want to be apprehended while carrying a regulated firearm.

In our view, *Thompson* is distinguishable. Thompson was constrained from providing an alternative explanation for his flight, because to do so would place evidence of additional criminal acts before the jury, which could unduly influence the jury to his prejudice. *Thompson*, 393 Md. at 314 n. 5, 901 A.2d 208. In the absence of an alternative explanation from Thompson for his flight, the flight instruction that was provided by the trial court was prejudicial, if not actively misleading to the jury regarding Thompson's possible reasons for fleeing from the police. *Id.* at 315, 901 A.2d 208.

In the instant case, however, appellant's illegal possession of a regulated firearm was a charged offense, concerning which the jury heard substantial evidence throughout appellant's trial. There was no concern that the jury might be tainted or misled by evidence indicating that appellant fled because he was in possession of the gun rather than out of involvement in the shooting. *See id.* at 315, 901 A.2d 208 ("Where the defendant possesses an innocent explanation that does not risk prejudicing the jury against him, it would be expected that the defendant would present his purported reasons for his flight to the jury."). Indeed, twice during his closing statement, defense counsel made exactly that argument, proffering to the jury appellant's alternative reason for fleeing from the police.

Additionally, the jury instruction also emphasized that potentially innocent factors may motivate an individual's flight. The jury was directed that, if they found evidence of flight,

they must then decide if that evidence demonstrated a consciousness of guilt. Thus, we are persuaded that the instruction properly left to the jury the determination of whether appellant's action constituted flight, and if so, whether his flight was motivated by consciousness of his guilt for any of the charged offenses.

The testimony of the various witnesses, as we have reviewed, constituted more than "some evidence" that appellant fled on the night he was arrested. *See Thomas*, 372 Md. at 355, 812 A.2d 1050 (stating that either direct or circumstantial evidence may connect a defendant's consciousness of guilt to the crime charged; the requirement is only for "some evidence" to generate the instruction); *Dykes v. State*, 319 Md. 206, 216–17, 571 A.2d 1251 (1990) (noting that the requirement that there be "some evidence" to generate an instruction does not establish a specific standard; "It calls for no more than what it says—'some', as that word is understood in common everyday usage."). The trial court did not abuse its discretion by providing the flight instruction.

In sum, we find neither error nor abuse of discretion in the rulings of either the motions court or the trial court.

**JUDGMENTS OF THE CIRCUIT COURT FOR WICOMICO COUNTY AFFIRMED. COSTS ASSESSED TO APPELLANT.**